**UNITED STATES of America, Appellee,**

v.

**Lewis Daniel WINSTEAD, Appellant.**

No. 82–5251.

United States Court of Appeals, Fourth Circuit.

Argued March 11, 1983.

Decided June 1, 1983.

---

Wade M. Smith, Raleigh, N.C. (Douglas E. Kingsbery, Tharrington, Smith & Hargrove, Raleigh, N.C., on brief), for appellant.

Robert H. Edmunds, Jr., Asst. U.S. Atty., Greensboro, N.C. (Kenneth W. McAllister, U.S. Atty., Greensboro, N.C., on brief), for appellee.

Before WIDENER and PHILLIPS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

WIDENER, Circuit Judge:

Defendant Daniel Winstead was convicted on two counts of aiding and abetting in the false identification and marketing of flue-cured tobacco, in violation of 18 U.S.C. §§ 2, 1001. He has appealed the conviction on the ground that the government failed to produce sufficient evidence to support the verdict. We agree and therefore reverse the conviction.

## I.

This case arises out of an investigation conducted in 1981 by the United States Department of Agriculture involving various North Carolina tobacco warehouses. Special agents of that department were obviously investigating violations of federal regulations concerning the marketing of flue-cured tobacco. See 7 C.F.R. §§ 725.-50–.116. Under these regulations, a marketing card is issued to tobacco farmers "for each farm having tobacco available for marketing." Id. § 725.87(a). The card indicates the maximum number of pounds of tobacco grown on the farm that can be marketed. Id. § 725.87(f).

If a farmer raises less than his quota for a given farm, he can lease his extra poundage allotment to any owner or operator of another farm within the same county. Id. § 725.72. This generally allows a farmer who has grown more than his quota on a particular farm to sell the extra tobacco on excess pounds allotted to another farm within the same county. The marketing of a farm's excess tobacco on a card issued for a farm in another county, however, violates the regulations as a false identification of tobacco. Id. §§ 725.90, .95(b). It was this kind of violation that the agents in the instant case were investigating.

Pursuant to the investigation, Agent Collins on several occasions contacted the defendant Winstead, a warehouseman, at Winstead's warehouse in Person County, North Carolina. On Collins' first visit to the warehouse, he represented himself as a new farmer who had not raised his quota for his farm in Rockingham County, North Carolina. Collins told Winstead that, because he was going to have extra pounds on his marketing card, he wanted to find someone with excess tobacco. Winstead responded that he was willing to help Collins out.

On a subsequent trip to the warehouse, Winstead approached Collins and asked whether anyone had talked to him. Upon Collins' negative reply, Winstead walked over to a farmer, James Wade, and talked with Wade for about a minute.[1] Wade then approached Collins and entered into an illegal agreement to sell Wade's excess tobacco on Collins' card. No evidence was presented as to the location of Wade's farm on which he raised tobacco, only as to his address. Wade, however, testified that the agreement was illegal, and therefore we can assume that the tobacco Wade agreed to sell on Collins' card was not grown in the same county as that for which Collins' card was issued.

Later that same day, as Collins was leaving the warehouse, he saw Winstead talking to another tobacco farmer, Rudolph Griffin. Winstead pointed at Collins and said, "That man can help you with pounds, I think." Griffin then approached Collins and, as Wade, entered into an illegal agreement to sell Griffin's tobacco on Collins' card. Again, although no evidence was presented as to the location of Griffin's farms,[2] there was evidence that the agreement involved the false identification of Griffin's tobacco and therefore was illegal.

1. Although Wade testified for the government at trial, the government failed to elicit any testimony from him or produce any other evidence as to the substance of this conversation despite its obvious relevancy.

## II.

The defendant claims that there was insufficient evidence to support a conviction of aiding and abetting the two tobacco farmers in the false identification of their tobacco. Consequently, we must determine whether there is substantial evidence, taking the view most favorable to the government, to support the jury's verdict of guilty. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

To prove the crime of aiding and abetting the government must show that the defendant knowingly associated himself with and participated in the criminal venture. *Nye & Nissen v. United States*, 336 U.S. 613, 619, 620, 69 S.Ct. 766, 769, 770, 93 L.Ed. 919 (1949); *United States v. Beck*, 615 F.2d 441, 448 (7th Cir.1980); *United States v. Pearlstein*, 576 F.2d 531, 546 (3d Cir. 1978); *United States v. Di Stefano*, 555 F.2d 1094, 1103 (2d Cir.1977). To prove the element of association, the government must show that the defendant shared in the principals' criminal intent. *United States v. Beck*, 615 F.2d at 449. This requires evidence that the defendant be aware of the principals' criminal intent and the unlawful nature of their acts. *United States v. Pearlstein*, 576 F.2d at 546. Evidence that the defendant merely brought about the arrangement that made the criminal acts of the principals possible does not alone support a conclusion that the defendant was aware of the criminal nature of the acts. *United States v. Belt*, 574 F.2d 1234, 1240 (5th Cir.1978).

In the instant case, the government failed to produce substantial evidence to show that Winstead knew that Wade and Griffin intended to identify falsely their tobacco. As discussed above, selling excess pounds on another farm's unused quota is entirely legal if the farm is in the same

2. Sometime later, months after the transaction complained of had been completed, it turned out that one of Griffin's four farms was in Harnett County. Wade's tobacco was sold on a marketing card issued to a fictitious James Collins, and Griffin's was sold on a card issued to a fictitious Jim Barr.

county in which the tobacco was grown. 7 C.F.R. § 725.72. Moreover, no law prohibits tobacco farmers from making quite lawful agreements on the warehouse floor to sell excess tobacco on another farm's quota, and, indeed, there was uncontradicted evidence from the local ASCS agent that 95% of the agreements for leasing excess pounds were made other than in the ASCS office. Such agreements only become illegal, in the context present here, wherever made, when they involve the false identification of tobacco grown in one county on the marketing quota issued for a farm in another county. *Id.* §§ 725.90, .95(b).[3]

To prove that Winstead knew Wade and Griffin intended to enter into illegal agreements with Collins when Winstead pointed Collins out to them, the government had to produce evidence that Winstead knew both the location of Collins' farm[4] on account of which his marketing card was issued and the farms on which Griffin and Wade grew the tobacco they offered for sale. The jury could find that Winstead had knowledge of Wade's and Griffin's criminal intent only if there was evidence that Winstead knew that their tobacco was grown in a different county than that from which Collins' farm was located and his card was issued. The government, however, failed to produce substantial evidence of such knowledge.

Viewed in the light most favorable to the government, the evidence showed that Agent Collins told Winstead that he owned a farm in Rockingham County. However, Griffin, a government witness, testified that he had never before met Winstead, he did not tell Winstead where he lived, and he did not inform Winstead of his illegal plan. The entirety of Griffin's conversation with Winstead consisted of Griffin's asking about extra poundage and Winstead's reply

that Collins probably had some. The conversation lasted about five seconds. Consequently, according to Griffin's uncontradicted testimony, Winstead had no way of knowing the origin of Griffin's tobacco or that Griffin intended to enter into an illegal marketing agreement. Certainly we cannot require that, without positive evidence to the contrary, a tobacco warehouseman must presume the illegality of all excess pounds transactions of which he becomes aware. We therefore hold that the government failed to present sufficient evidence that Winstead aided and abetted Griffin in illegally marketing his tobacco.

With respect to Wade, the government produced evidence that Wade had known Winstead all of Wade's life. There was, however, no evidence, that, on the day Winstead directed Wade to Collins, Wade informed Winstead of his illegal plans. There also was no evidence that Winstead knew the location of the farm on which the particular tobacco Wade was trying to market was grown.

Even if the evidence showed that Winstead knew where Wade lived, which it did not, this would not provide a substantial basis for an inference that Winstead knew where Wade's tobacco came from. One can own or farm land in a different county than one's residence. Moreover, a tobacco farmer can own or farm several different farms.[5] Some or all might lie in a different county than the farmer's residence, they might each lie in separate counties, and any particular farm might lie in more than one county. Finally, a farmer can lease tobacco and grow it outside his home county. We conclude that evidence that Wade had known Winstead all of Wade's life does not alone provide a substantial basis for a jury to infer that Winstead knew in which coun-

---

3. The regulations also require that excess pounds transactions be approved by the county committee of the state Agricultural Stabilization and Conservation Service (ASCS). 7 C.F.R. § 725.72(c). No issue was made at trial or on appeal of that requirement and the case was tried solely on the theory of falsely identifying tobacco grown in one county as being from another upon the sale thereof.

4. Collins, of course, so far as this record shows, did not actually own a farm. However, he represented himself as owning a farm, and he obtained a tobacco marketing card purportedly issued to that farm.

5. Griffin, for example, testified that he grew tobacco on four different farms.

ty the particular tobacco that Wade was trying to sell was grown. We therefore hold that the government also failed to present substantial evidence that Winstead, when he directed Wade to Collins, knew that Wade intended to enter into an illegal agreement to falsely identify tobacco.

In asserting that there was substantial evidence of aiding and abetting, the government relies on a statement made by Winstead after he pointed out Collins to Griffin. The statement, which was recorded through a device worn by Collins, was as follows:

> You'll like, I say—all, I can tell ya [inaudible] so you'll—you'll—you'll just—I don't know nothing about this thing being a warehouseman—ain't supposed to participate in—ah—that activity when a man drives up in the damn door—if he's got a sale card and 'bacco I'm gonna sell his 'bacco.

The statement just recited is at best ambiguous. Taken in the light most favorable to the government the statement may say that Winstead denied any participation in the excess pounds transactions because he knew they were illegal. But a more reasonable reading is that Winstead said he was not going to inquire from each farmer who brought tobacco in for sale if that farmer was engaging in any illegal activity by way of selling tobacco grown in one county on the card from another, and that he was not becoming involved in any excess pounds transactions. The ASCS regulations referred to at the outset of this opinion do not require, or even contemplate, any such inquiry as to legality, and that it might be ruinous for one warehouseman if all others did not make the same inquiry is self-evident.

The jury, of course, was free to disbelieve Winstead's testimony that he did not take part in arranging for leases of excess pounds to anyone including Griffin or Wade. Nevertheless, to infer that Winstead was saying that he could not get involved in the excess pounds transactions at issue here because he knew they were illegal runs counter to the undisputed facts and the context in which the statement was made. First, the mere sale of excess pounds is not illegal, in the ordinary course of things the contrary is true. Second, the statement was made after Winstead pointed out Collins to Griffin. As discussed above, according to Griffin's uncontradicted testimony, he gave Winstead absolutely no reason to believe that an illegal transaction was planned. Therefore to infer from Winstead's statement that he knew that Griffin intended to make an illegal marketing agreement would be worse than conjecture or speculation; it would contradict the only evidence the jury had regarding the extent of Winstead's knowledge of Griffin's intent. We therefore conclude that Winstead's above quoted statement is not substantial evidence upon which a jury finding of guilty could be based.

### III.

In conclusion, we hold that the government failed to produce substantial evidence that the defendant was aware of Wade's and Griffin's criminal intent when he directed them to Agent Collins. Specifically, the government failed to show that the defendant was aware that Wade's and Griffin's tobacco was grown in a different county than that in which Agent Collins' farm purportedly was located. Thus, an essential element of aiding and abetting, that of knowing association with a criminal venture, was not proved as to either count of the indictment.

Accordingly, the judgment of conviction is

REVERSED.