**UNITED STATES of America**

v.

**Roy Yates AMMONS, Don Maynard Cody, and Glen Samuel Martin, Jr., Defendants.**

**Nos. A–CR–87–80–01 to A–CR–87–80–03.**

United States District Court, W.D. North Carolina.

Feb. 25, 1988.

Ronald W. Howell, Asheville, N.C., for Cody.

Robert B. Long, Jr., Asheville, N.C., for Martin.

## ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on Cody's and Martin's Motions for Judgment of Acquittal and New Trial, filed January 12, 1988 and January 14, 1988. For the reasons that follow, Defendants' motions will be denied.

## BACKGROUND

On September 9, 1987, the grand jury returned a one-count indictment charging Defendants Ammons, Cody, and Martin with conspiracy, in violation of Section 371 of Title 18, United States Code. The indictment alleges that Defendants conspired to violate regulations governing the marketing of tobacco, a violation of 7 C.F.R. §§ 726.51(k), 726.98, and conspired to make false statements to a federal agency, a violation of 18 U.S.C.A. § 1001 (West 1976 & Supp.1987). The indictment alleges that the conspiracy was formed and conducted in the following way:

It was a part of the conspiracy that ... AMMONS, owner and operator of several farms located in Madison County North Carolina, within the Western District of North Carolina, would and did telephonically contact ... CODY, who has a working relation with Big Burley Tobacco Warehouse ... to determine if ... MARTIN ..., owner and operator of Big Burley Tobacco Warehouse ... would be interested in obtaining ... AMMONS' tobacco marketing cards to sell tobacco produced on a farm other than that which the card was issued to.

It was further part of the conspiracy that ... CODY would and did telephonically contact ... AMMONS ... to inform ... AMMONS that ... MARTIN ... would purchase the pounds of tobacco remaining eligible for sale on his tobacco marketing cards for the payment price of

Jerry Miller, Asst. U.S. Atty., Asheville, N.C., for plaintiff.

Stephen E. Huff, Marshall, N.C., for Ammons.

50 cents per pound, payable to ... AM-MONS.

It was a part of the conspiracy that ... AMMONS and ... CODY would and did meet with one another and that ... AMMONS would and did provide his tobacco marketing cards to ... CODY during said meeting.

It was a part of the conspiracy that ... MARTIN ... would and did buy AMMONS' tobacco marketing cards and would and did use those tobacco marketing cards for the sale of tobacco.

It was a further part of the conspiracy that approximately one week after ... AMMONS' meeting with ... CODY ..., ... AMMONS and ... CODY would and did meet a second time, wherein ... CODY provided ... AMMONS with $6,911.50 in cash as payment for the sale of tobacco by Big Burley Tobacco Warehouse using ... AMMONS' tobacco marketing cards.

Indictment at 1–2, *United States v. Ammons*, A–CR–87–80 (W.D.N.C. filed Sept. 9, 1987).

On November 2, 1987, Ammons pleaded guilty to conspiracy. On January 11, 1988, a jury found Cody and Martin guilty of having conspired to violate both the regulations and the federal statute. The evidence produced at the trial tracked the indictment's descriptions of the Defendants' activities.

On January 14, 1988, this Court sentenced all three Defendants. Ammons was ordered to pay a $500 fine, restitution in the amount of $6,911.50, and a $25 assessment. Cody was sentenced to a 60–day term of imprisonment, which was suspended, and he was placed on probation for a term of one year; he was also ordered to pay a $500 fine and a $50 assessment. Martin was sentenced to a three-year term of imprisonment, which was suspended, and he was placed on probation for a term of three years; he was also ordered to pay a $10,000 fine, restitution in the amount of $13,288.30, and a $50 assessment.

On January 12, 1988, Cody filed a Motion for Judgment of Acquittal and a Motion for New Trial. On January 14, 1988, Martin filed a Motion for Judgment of Acquittal and a Motion for New Trial. These motions are now pending before this Court.

## CONTENTIONS OF THE PARTIES

### Cody

Cody raises a number of issues in support of his motions. First, Cody contends that the evidence produced at trial was insufficient to establish Cody's liability for the charge of conspiracy. Cody supports his assertion by examining the testimony of Ammons, who was the Government's key witness. Cody asserts that Ammons' testimony does not implicate Cody and, in fact, exculpates him. Cody further asserts that there was no other evidence presented at the trial which would support his conviction.

Second, Cody shows to this Court the case of *United States v. Winstead*, 708 F.2d 925 (4th Cir.1983), in order to support his assertion that he lacked the necessary mental state to support either a conviction for conspiracy or a conviction for aiding and abetting the conspiracy. Cody relies heavily upon the *Winstead* court's holding which states that a defendant can only be found guilty of aiding and abetting if he "knowingly associated himself with and participated in the criminal venture," *id.* at 927, and was "aware of the principals' criminal intent and the unlawful nature of their acts." *Id.*

Third, Cody argues at length that conspiracy and aiding and abetting are two different crimes with different elements. In particular, Cody notes that the crime of conspiracy contains the element of *agreement* which is not contained within the crime of aiding and abetting. Cody asserts that he never agreed with either Ammons or Martin to commit the crimes charged in the indictment and that none of the evidence produced at trial directly or indirectly demonstrated the existence of such an agreement. As Cody explains:

The most that could be inferred from th[e] evidence, giving the [Government] the benefit of every doubt, would be that Cody engaged in affirmative conduct designed to aid in the success of a venture planned by Ammons and it could be in-

ferred, taking the evidence in [the] light most favorable to the government, that he knew his actions would assist Ammons.

. . . .

Taking the evidence in the light most favorable to the [Government] . . . shows that Ammons in his own mind concocted or devised a scheme to sell excess poundage; that he called Cody and asked him to relay his offer to the owner of a warehouse in Tennessee, [Martin]; that Cody relayed the offer to the man in Tennessee and then carried Ammons' cards to Tennessee and returned his cards later in a sealed envelope.

Assuming that Ammons' motive and intent at that time was unlawful and not that of an investigator, and Cody from the very nature of the transaction assumed that it was or might be illegal, *the very most it can be implied [sic] that he did was to perform affirmative acts which aided the success of Ammons and his venture and that he had knowledge that his actions would assist Ammons.*

Since Ammons testified, and it is not uncontradicted, that he never told Cody of his intent the circumstances that can be inferred from his action when he received no compensation and when no conversation was held with Ammons concerning the falsification of documents or anything alleged in the indictment, the government offered proof at the most that *Cody may have aided or abetted Ammons in the accomplishment of some unlawful purpose.*

Cody's Motion for Judgment of Acquittal at 20–21, *United States v. Ammons*, A–CR–87–80 (W.D.N.C. filed Jan. 12, 1988) (emphasis added).

Fourth, Cody argues that the only evidence offered by the Government to prove Cody's knowledge was his longtime involvement in the tobacco business from which it could be inferred that he knew that false identification of tobacco was being contemplated by Ammons and Martin. Cody argues that it would be improper to base his conviction upon such an inference, and notes the following:

This inference cannot be drawn for two reasons: first, Ammons contradicts it by direct evidence; second, the inference that the man who claimed to be the leader of tobacco growers in western North Carolina and belonged to many organizations, when asking Cody to deliver his cards to Tennessee knew exactly what he was doing and that it was perfectly legal. The logical assumption, if the testimony is scrutinized is that if anything, Ammons probably wrote or helped write such regulations. [Ammons] would have been shocked to have been questioned [by Cody] in his position.

*Id.* at 23.

Fifth, Cody asserts that Ammons' intent, at the time he first approached Cody about sending messages to Martin, was not unlawful. According to Cody, Ammons originally only intended to investigate the possible unlawful activities of Martin, and toward that end, set out to engage in an "undercover" type of operation. Cody argues that Ammons, who first initiated the conspiracy, did not intend to violate the law, and therefore Cody's conviction for conspiracy cannot stand because either Ammons' intent was not unlawful or Cody did not know of Ammons' intent to violate the law.

Finally, Cody argues that the impact of Ammons' testimony, which according to Cody is exculpatory, was lost upon the jury since there was a four-day delay, due to snow conditions, between Ammons' testimony and the rest of the Government's case. Cody asserts that he was prejudiced and his counsel severely handicapped by the delay.

*Martin*

Martin, in contrast to Cody, has raised relatively few points to support his motions. First, Martin asserts that the evidence produced at trial fails to support Martin's conviction for conspiracy because (1) no agreement was shown, (2) Ammons and Martin had no contact, (3) and Cody, the only link between Ammons and Martin, was not shown to be a member of any conspiracy. Second, Martin argues that

the trial of his case within the Western District of North Carolina violated his Sixth Amendment rights because the evidence did not establish that the agreement was formed within the district, nor did it establish that Martin ever had any direct contact with the district. Third, Martin asserts that this Court erred by not finding by "clear and convincing" proof that the testimony of Robert Lee Nelson was admissible under Rule 404(b) of the Federal Rules of Evidence. Finally, Martin contends that the reasons set forth in Cody's motions for acquittal and for a new trial apply with equal force to Martin because Cody is "the only possible link between Defendant Martin and Defendant Ammons." Martin's Motion for Judgment of Acquittal at 2, *United States v. Ammons,* A–CR–87–80 (W.D.N.C. filed Jan. 14, 1988).

### The Government

The Government has offered its version of the evidence produced at trial as a response to Defendants' motions. First, the Government describes Cody's role in the conspiracy as that of "broker or middleman." According to the Government, Ammons approached Cody and told him that he wanted to sell pounds of tobacco remaining on his tobacco marketing card to Defendant Martin. Cody relayed Ammons' offer to Martin, and he received an affirmative response from Martin, which Cody relayed to Ammons. Sometime after taking Ammons' tobacco marketing cards to Martin, Cody received a package containing the proceeds from sales of the tobacco pounds, and he delivered the proceeds to Ammons along with falsified documents from the sales. The Government asserts that "[t]he clear implication of the evidence is that Cody was familiar with the tobacco business and was well aware of the illegality of the transaction." Government's Response at 1, *United States v. Ammons,* A–CR–87–80 (W.D.N.C. filed Jan. 21, 1988).

The Government also contends that the evidence showed that Martin agreed to conspire to violate the tobacco marketing regulations: Cody contacted Martin about the illegal transaction, and Martin accepted the offer as evidenced by two checks, representing the proceeds of the sales, which were deposited in Martin's accounts. In addition, the Government asserts that Martin's intent was clearly established by evidence of a similar illegal transaction involving Robert Lee Nelson one year later. The Government concludes that the jury could properly infer that Martin and Cody knowingly conspired to falsely market tobacco and knowingly committed overt acts to further the objects of the conspiracy.

## ANALYSIS OF THE APPLICABLE LAW

### I

When defendants challenge the evidence adduced at trial, they can seek redress in the trial court in two ways: They can move either for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure or for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. The first procedure asks the trial court judge to assess the *sufficiency* of the evidence, and the second procedure asks the trial court judge to assess the *weight* of the evidence. *See United States v. Arrington,* 757 F.2d 1484, 1485 (4th Cir.1985); *Tibbs v. Florida,* 457 U.S. 31, 38 n. 11, 102 S.Ct. 2211, 2216 n. 11, 72 L.Ed.2d 652 (1982) (explaining the standards used when determining motions based on insufficiency of the evidence and weight of the evidence). In the present case, Defendants Cody and Martin have made both types of motions in a timely fashion.

On a motion for a judgment of acquittal made pursuant to Rule 29 of the Federal Rules of Criminal Procedure the district court judge must take all the evidence presented at trial and assess it in the light most favorable to the Government. *E.g., United States v. Dominguez,* 604 F.2d 304, 310 (4th Cir.1979) (citing *Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2149–50, 57 L.Ed.2d 1 (1978)), *cert. denied,* 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980). *See generally* 2 C. Wright, *Federal Practice and Procedure* § 467 (2d ed. 1982). If the evidence so viewed is sufficient such that the jury, as a rational factfinder, *might* find the defendant guilty be-

yond a reasonable doubt of every element of the offense, then the court must deny defendant's motion. *United States v. Wooten*, 503 F.2d 65, 66 (4th Cir.1974); *United States v. Sawyer*, 294 F.2d 24, 31 (4th Cir.), *cert. denied*, 368 U.S. 916, 82 S.Ct. 196, 7 L.Ed.2d 132 (1961); *White v. United States*, 279 F.2d 740, 748 (4th Cir.), *cert. denied*, 364 U.S. 850, 81 S.Ct. 96, 5 L.Ed.2d 74 (1960). It is not necessary that the trial court be convinced beyond a reasonable doubt of the guilt of the defendant. *Sawyer*, 294 F.2d at 31. On appeal, the courts apply a standard of review which mandates sustaining the jury's verdict when there is substantial evidence, taking the view most favorable to the Government, to support a finding of guilt beyond a reasonable doubt. *United States v. Steed*, 674 F.2d 284 (4th Cir.) (citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)), *cert. denied*, 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 68 (1982); *United States v. Sherman*, 421 F.2d 198 (4th Cir.), *cert. denied*, 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970). *See generally Jackson v. Virginia*, 443 U.S. 307, 316–320, 99 S.Ct. 2781, 2787–2790, 61 L.Ed.2d 560 (1979) (explaining court's and jury's roles in determining guilt by standard of proof beyond a reasonable doubt).

By contrast, on a motion for a new trial made pursuant to Rule 33 of the Federal Rules of Criminal Procedure a district court judge has broad power to grant a new trial if the judge concludes that, for any reason, the trial has resulted in a miscarriage of justice. *United States v. Shipp*, 409 F.2d 33, 36–37 & n. 7 (4th Cir.1969), *cert. denied*, 396 U.S. 864, 90 S.Ct. 140, 24 L.Ed.2d 117 (1969). *See generally* 3 C. Wright, *Federal Practice and Procedure* § 551 (2d ed. 1982). The United States Court of Appeals for the Fourth Circuit has noted that:

> When the motion [for a new trial under Rule 33, Fed.R.Crim.P.,] attacks the weight of the evidence, the [trial] court's authority is much broader than when deciding a motion to acquit on the ground of insufficient evidence. In deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government. Thus, it may evaluate the credibility of the witnesses. When the evidence weighs so heavily against the verdict that it would be unjust to enter judgment, the court should grant a new trial.

*United States v. Arrington*, 757 F.2d at 1485 (citing *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982)). Since the trial judge has the advantage of observing the witnesses as they testify and being familiar with the entire record, the grant or denial of a motion for a new trial is committed to the trial court's sound discretion, and its decision will only be overturned on appeal when that discretion is abused. *United States v. Shipp*, 409 F.2d at 36; *United States v. Wechsler*, 406 F.2d 1032, 1033 (4th Cir.1969).

Since Defendants have made both Rule 29 and Rule 33 motions, this Court will have to consider the merits of their arguments under two very different standards. The Rule 29 motions will be considered first since they require this Court to analyze the evidence under the more stringent standard.

## II

In the present case the jury found Defendants Cody and Martin guilty of conspiring to violate the regulations governing the sale of tobacco and of conspiring to submit false statements to a federal agency. The statute defining the elements of the federal crime of conspiracy is set out in Section 371 of Title 18, United States Code, which reads as follows:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C.A. § 371 (West 1966 & Supp. 1987). "The gist of the offense of conspiracy as defined by [Section 371 of Title 18, United States Code,] is agreement among conspirators to commit an offense attended

by an act of one of the conspirators to effect the object of the conspiracy." *United States v. Falcone*, 311 U.S. 205, 210, 61 S.Ct. 204, 206, 85 L.Ed. 128 (1940); *see also Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 1289–90, 43 L.Ed.2d 616 (1975) ("Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act."), *overruled on other grounds, Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). *See generally* W. LaFave & A. Scott, *Handbook on Criminal Law* § 61, at 460–468 (2d ed. 1972). "To be guilty of conspiracy, a defendant must possess '*at least* the degree of criminal intent necessary for the substantive offense itself.'" *United States v. Dumas*, 688 F.2d 84, 86 (10th Cir.1982) (quoting *Ingram v. United States*, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959)). If a defendant knows of the conspiracy's criminal objectives then he has the requisite criminal intent. *See Direct Sales Co. v. United States*, 319 U.S. 703, 711, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943). The Government must show the defendant's knowledge by clear, unequivocal evidence. *Direct Sales Co.*, 319 U.S. at 711, 63 S.Ct. at 1269.

Defendants Cody and Martin were found guilty of having conspired to violate two types of laws: Tobacco regulations and a federal statute. Section 726.98 of Title 7 of the Code of Federal Regulations states, in pertinent part, the following:

> [A]ny warehouseman, processor, buyer, dealer, trucker, or person engaged in the business of sorting, redrying, prizing, stemming, packing, or other processing tobacco who fails to make any report or keep any record as required, or who makes any false report or record, is guilty of a misdemeanor, and upon conviction shall be subject to a fine of not more than $500 for each offense.

7 C.F.R. § 726.28 (governing burley tobacco). Section 726.51(k)(1) of Title 7 of the Code of Federal Regulations goes on to define false identification as the marketing of tobacco in a marketing year as having been produced on a farm when, in fact, it was produced on a different farm. 7 C.F.R. § 726.51(k)(1).

The federal statute which Defendants were convicted of conspiring to violate reads as follows:

> Whoever in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C.A. § 1001 (West 1976 & Supp. 1987).

First, as noted previously, Defendant Cody contends that the evidence was insufficient to sustain a guilty verdict on the charged conspiracy count because he did not enter into an agreement with anyone to violate either the regulations or the statute. Cody argues:

> The most that could be inferred from [the evidence produced at trial], giving the [Government] the benefit of every doubt, would be that Cody engaged in affirmative conduct designed to aid in the success of a venture planned by Ammons and it could be inferred, taking the evidence in [the] light most favorable to the [G]overnment, that he knew his actions would assist Ammons..... ...[T]he [G]overnment offered proof at the most that Cody may have aided and abetted Ammons in the accomplishment of some unlawful purpose.

Defendant Cody's Motion for Judgment of Acquittal at 21, *United States v. Ammons*, A–CR–87–80 (W.D.N.C. filed Jan. 12, 1988).

■ Defendant Cody is willing to concede that he acted only as an aider and abettor because he has distinguished aiding and abetting from the crime of conspiracy. Cody correctly notes that a conspiracy requires an agreement, and that aiding and abetting does not require an agreement. Cody also correctly notes that no evidence was adduced at trial to demonstrate that Cody entered into an agreement with Am-

mons or Martin to violate the law. Defendant Cody has failed to realize, however, that his role as a knowing aider and abettor to the offense charged in this action does provide a basis on which to find him liable as a co-conspirator. Cody's knowing actions are sufficient to make him liable as a principal in the conspiracy because, as explained below, he actually enabled *the agreement itself* to come into being. Thus, this Court does not need to consider whether the evidence of Cody's other actions, which also aided Ammons and Martin, would be sufficient to sustain the jury's verdict.

Cody did not merely aid and abet his co-defendants in their commission of the underlying substantive crimes which were the object of the conspiracy charged in this action. While there is some controversy concerning the liability of those who aid a conspiracy in the commission of the substantive crimes that are the object of the conspiracy, it is clear that one who aids in the *formation* of the agreement which is the basis of the conspiracy is punishable as a principal. As one commentator has explained:

> A person does not aid and abet a conspiracy by helping the "conspiracy" to commit a substantive offense which is its object. It is necessary to help the "conspiracy" in the commission of the crime of conspiracy, that is, in the commission of the act of agreement. *Only then is is justifiable to dispense with the necessity of proving the commission of the act of agreement by the defendant himself.* In all other cases, to convict the defendant of conspiracy it is necessary to prove not only knowledge on his part that he was helping in a wrongful enterprise, but also knowledge on another's part that he intended to do so, and at least a tacit agreement to give and accept such help.

*Developments in the Law—Criminal Conspiracy*, 72 Harv.L.Rev. 920, 934–935 & nn. 79–80 (1959) (footnotes omitted and emphasis added).

At least one federal circuit court has recognized that one may aid and abet a conspiracy by acting as a liason between the principal conspirators. *See United States v. Galiffa*, 734 F.2d 306, 309 & n. 5 (7th Cir.1984). In *Galiffa*, the defendant argued that "since the agreement is the essence of a conspiracy one can only aid and abet a conspiracy by facilitating the creation of the agreement to commit the substantive crime." *Id.* (citing *People v. Strauch*, 240 Ill. 60, 88 N.E. 155 (1909)). The defendant in *Galiffa* was willing to admit that he would be guilty as a conspirator if he aided in the formation of the conspiracy because he did not, in fact, provide such assistance. The *Galiffa* court found that defendant was indeed liable for aiding the conspiracy, *id.* at 309–311, but before doing so the court noted that "one can aid and abet a conspiracy by bringing the parties together to enter into the illicit agreement." *Id.* at 309.

The leading case dealing with this precise legal question is *People v. Strauch*, 240 Ill. 60, 88 N.E. 155 (1909), *cited with approval in Developments in the Law—Criminal Conspiracy*, 72 Harv.L.Rev. 920, 934–935 (1959). *Strauch* is important in order to illustrate how one may aid a conspiracy in its formation, and, therefore, it will be discussed in some detail.

In *Strauch*, three defendants were indicted for unlawfully conspiring to prevent competitive bids on public contracts for the construction of bridges. Two of the defendants were father and son. The father, Andrew Strauch, was a member of the board of supervisors for the town of Fair Haven, and that town planned to build four bridges at public expense. One of Strauch's three sons, Oswald Strauch, was a recent mechanical engineering graduate, and two other sons were attending university classes. The sons wanted to bid on the bridges in order to gain employment during the summer months, and the father also wanted them to be employed; he obtained the necessary information they would need in order to bid upon the bridge projects. The father, as a member of the board of supervisors, arranged to have committees set up that would handle the bridge construction and determine whether county aid would be granted, and he obtained information from bridge contractors in order to help his sons bid on the bridge construction projects.

The committees held a meeting in order to award the bridge contracts. On that day, however, only one bridge contractor appeared, Hubert E. Hughes. The committees informed Andrew Strauch that the contracts would not be awarded unless there was more than one bid for each bridge. Strauch conversed with Hughes, told him that his sons were intending to bid on some of the contracts, and advised him to "talk it over with the boys." Andrew Strauch introduced Hughes to his son Oswald, and then withdrew while saying "Whatever you do, do not get me mixed up in any of your deals; you and Hughes figure it over, but do not mix my name in any of your deals." Thereafter, Hughes and Oswald Strauch entered into an agreement to make sham bids on the bridges so that each would receive at least one contract award.

The *Strauch* court found that Andrew Strauch was liable as a conspirator, and held as follows:

> The gist of the offense is the combination or confederacy for the illegal purpose of preventing competition in the letting of the contract in question. If Andrew A. Strauch innocently introduced his son to Hughes, the mere fact that these parties, as a result of such acquaintance, might ultimately enter into a conspiracy would not make Andrew A. Strauch a party thereto, even though his act in introducing the parties might be the means of bringing about the ultimate conspiracy. The criminality of his act in such case would necessarily depend upon the guilty intention or purpose he had in view in thus bringing the parties into communication with each other. If [Andrew Strauch] did the act ... with the unlawful purpose [of bringing the parties into an unlawful agreement with each other then] the conclusion ... that he would be guilty as a party to such conspiracy appears to be the necessary legal result....

*Strauch,* 240 Ill. at 71, 88 N.E. at 159.

In the present case, there was ample evidence from which it could be inferred that Cody knew he was aiding Ammons and Martin in their efforts to communicate and reach an agreement to violate the law.

Ammons first asked Cody to go to Martin and see if he wanted to sell any excess poundage. In essence, Ammons communicated an offer to Martin, and Cody acted as the vehicle for the offer. Cody did as Ammons asked him, and returned with an affirmative reply and a price figure. In effect, Martin accepted Ammons' offer, and he also used Cody as messenger. The agreement would not have come into existence at all without Cody's assistance. From all the circumstances surrounding the Ammons' original offer and Martin's acceptance it certainly can be reasonably inferred that Cody knew they were planning to falsely identify and market tobacco. In addition, Cody signaled his intention to assist in the consummation of the agreement by delivering Martin's acceptance to Ammons while knowing that Ammons and Martin were planning an illegal venture to market tobacco.

Cody's knowledge of the unlawfulness of the plan can be inferred from his background in the tobacco industry and from the communications that he relayed between Ammons and Martin. It is perfectly legal to market on a tobacco marketing card tobacco grown in same county as the farm that the card is assigned to, but it is obvious that such an arrangement would necessitate some coordination between the holder of the card and the party that had excess tobacco. Such coordination, however, does not reasonably appear from the bare offer and acceptance Cody relayed between Ammons and Martin. Instead, it would appear obvious to anyone familiar with the tobacco business, as Cody was, that Ammons and Martin did not intend to market on Ammons' tobacco marketing cards tobacco grown in the same county as Ammons' tobacco farms. It is the "bare bones" nature of the agreement itself which marks it as an illegal agreement. In addition, the surreptitious nature of Ammons' and Martin's communications through an intermediary must have signaled to the intermediary, Cody, their unlawful intentions.

In *United States v. Barnes,* 747 F.2d 246, 249 (4th Cir.1984), the United States Court of Appeals for the Fourth Circuit

considered the amount of evidence that needs to be shown in order to support an inference that an illegal agreement to market tobacco has been entered into. *Barnes* is useful because it illustrates that one can know the unlawful nature of a tobacco transaction from the circumstances surrounding it, and it establishes that the jury could properly infer that Cody actually had knowledge of the unlawful transaction which he brought about.

In *Barnes,* a man named Williamson asked defendant Barnes, a tobacco buyer, if he could "move or sell or take care of" some excess tobacco which Williamson had grown that year. *Id.* at 248. Barnes told Williamson that he would give him an answer, and a few days later told him that he could take care of the excess tobacco for fifty-five cents a pound. Williamson agreed. *Id.*

Pursuant to the agreement, Barnes' son and Williamson's son met and together drove a truck containing Williamson's tobacco to a tobacco warehouse where it was unloaded and weighed. *Id.* Williamson's son did not display a tobacco marketing card, nor was he given a sale bill. Later the tobacco was sold on the tobacco marketing card of R.D. Lee Farms, Inc. for approximately one dollar and fifty-seven cents per pound. Thereafter, Barnes visited Williamson and paid him their agreed price of fifty-five cents per pound. *Id.*

Subsequently, Barnes, Barnes' son, and R.D. Lee Farms, Inc. were all indicted for conspiracy to falsely identify and market tobacco, in violation of Section 371 of Title 18, United States Code. Pursuant to a plea agreement, Williamson pled guilty to a charge of conspiracy, and, in return, his son was not indicted. At trial, the court entered a judgment of acquittal for Barnes' son at the conclusion of the Government's case, and the jury acquitted R.D. Lee Farms, Inc. Only Barnes was found guilty by the jury. *Id.* at 248–249.

Barnes appealed his conviction, and the *Barnes* court examined the sufficiency of the evidence presented on the conspiracy charge. The *Barnes* court noted the following, which should provide guidance to this Court in its consideration of the inferences that the jury could properly draw concerning Cody's knowledge of the conspiracy:

We agree with the government that we would be required to affirm the jury verdict if the only question was the sufficiency of the evidence. In considering the sufficiency of the evidence, we must sustain the judgment based on a jury verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision. Barnes argues that the evidence was insufficient to convict him because the government proved only an agreement between Barnes and Williamson— not an illegal agreement.

It is, of course, not necessary to prove the existence of an illegal agreement by direct evidence. Rather, a common purpose and plan may be inferred from all the circumstances. Moreover, the government need not establish that each conspirator had knowledge of all phases and details of the conspiracy, but only that the defendant participated in the conspiracy with knowledge of the essential nature of the plan.

It is true that Williamson never, by express words, asked Barnes to sell his surplus tobacco in violation of the law and regulations controlling the sale of tobacco. There was evidence, however, from which the jury could infer that illicit purpose: Williamson asked Barnes to "move or sell or take care of" tobacco which he identified as in excess of his allotment; the two men thereafter engaged in at least two vaguely phrased telephone conversations agreeing to sell the tobacco by procedures which were facially unorthodox; the younger Barnes and Williamson delivered the tobacco, without a receipt or marketing card, to a warehouse where Williamson could not legally sell tobacco; both Williamson and Barnes were experienced in growing and selling tobacco and both realized that Williamson's tobacco was in excess of his allotment; the tobacco was on the marketing card of another farm authorized to sell at that warehouse; and Barnes paid Williamson in cash without a bill of

sale or any accounting for the amounts sold or the balance of the sales price at the market.

*Barnes argues, however, that this evidence could support inferences of agreements to sell in a number of ways which could have been legal. This may be true—but the test is not whether the evidence would have supported another inference, but whether the evidence would have supported the inferences gleaned by the jury.*

United States v. Barnes, 747 F.2d at 249 (emphasis added).

■ In the present case, the transaction that Cody helped to bring about was also facially unorthodox. The jury could infer from the evidence that Cody knew of Ammons' unlawful intent because Cody was familiar with the tobacco business and therefore knew that the transaction proposed by Ammons was not lawful. The jury could have reached this conclusion by considering the price per pound that Martin offered to Ammons, which appears to be a relatively low price. *See* Trans. at 32, *United States v. Ammons*, A–CR–87–80 (W.D.N.C.) (partial transcript recording testimony of Ammons). In addition, the jury could have considered the structure of the transaction, which was set up so that Ammons would not have direct contact with Martin. Although Ammons testified that he used Cody as an intermediary because he did not know Martin personally, it does not seem likely that an entire legitimate transaction would occur without one direct contact, either by telephone or letter. The jury could have reasonably inferred that Cody must have known of the illegal nature of the transaction from its clandestine outline.

It is true that Ammons repeatedly testified that he never told Cody of his purpose. Cody's counsel has provided this Court with a partial transcript of the trial, and such transcript contains a record of Ammons' testimony. The transcript shows that Ammons denied telling Cody of his purpose several times. *Id.* at 17–26, 34–36. Apparently Cody assisted Ammons because he was Ammons' friend. Yet, a prior statement given by Ammons to the investigators in this action states that Ammons felt that Cody knew the venture planned by Ammons was illegal. *Id.* at 23.

■ In sum, the jury could have properly inferred that Cody knew of the illegal nature of the transaction. Although Ammons never told Cody of his "purpose," such purpose may have been, in Ammons' mind, to investigate the illegal activities of Martin, which Ammons suspected. Ammons may have had this laudatory purpose, but it does not provide him with a defense to the conspiracy charge. Ammons intended to enter into an illegal agreement to falsely market tobacco, and it is irrelevant that he had some higher purpose behind his actions. *See generally* W. LaFave & A. Scott, *Handbook on Criminal Law* § 27, at 200 & n. 29 (2d ed. 1972). Throughout his testimony when Ammons asserted that he did not tell Cody of his purpose, Ammons was, in all likelihood, referring to his investigatory purpose. The jury could have inferred from the evidence, however, that Cody knew of Ammons intent to enter into an illegal transaction and thereafter assisted Ammons in the completion of that intention. Cody's counsel has admitted as much to this Court in his motion: "The most that could be inferred from [the evidence produced at trial], giving the [Government] the benefit of every doubt, would be that Cody engaged in affirmative conduct designed to aid in the success of a venture planned by Ammons and it could be inferred, taking the evidence in [the] light most favorable to the [G]overnment, that he knew his actions would assist Ammons." Defendant Cody's Motion for Judgment of Acquittal at 21, *United States v. Ammons*, A–CR–87–80 (W.D.N.C. filed Jan. 12, 1988). By knowingly aiding Ammons in the formation of the agreement, Cody is liable as a principal in the conspiracy. *See United States v. Walker*, 621 F.2d 163, 165 (5th Cir.1980) ("18 U.S.C. § 2 does not define a crime. It simply makes punishable as a principal one who aids and abets the commission of a substantive crime."), *cert. denied*, 450 U.S. 1000, 101 S.Ct. 1707, 68 L.Ed.2d 202 (1981); *United States v. Galiffa*, 734 F.2d 306, 310–313 (7th Cir.1984); *United States v. Duke*, 409 F.2d 669, 671 (4th Cir.1969) ("we have con-

sistently held that under 18 U.S.C.A. § 2 one may be convicted of aiding and abetting under an indictment which charges only the principal offense"), *cert. denied*, 397 U.S. 1062, 90 S.Ct. 1497, 25 L.Ed.2d 683 (1970).

Cody's reliance upon *United States v. Winstead*, 708 F.2d 925 (4th Cir.1983), is misplaced because *Winstead* is distinguishable in several respects from the present case. *Winstead* involved an investigation conducted by the United States Department of Agriculture into the false marketing of flue-cured tobacco. The regulations governing flue-cured tobacco, *see* 7 C.F.R. §§ 725.50–.116, are similar to the ones governing burley tobacco, which are implicated in the present case. Both types of tobacco are regulated commodities that can only be legally sold by tobacco farmers using marketing cards issued by the Government. The cards indicate each farmer's maximum tobacco allowance for each farm. *Winstead*, 708 F.2d at 926. The *Winstead* court explained how marketing cards are used by farmers who grow flue-cured tobacco:

> If a farmer raises less than his quota for a given farm, he can lease his extra poundage allotment to any owner or operator of another farm within the same county. [7 C.F.R.] § 725.72. This generally allows a farmer who has grown more than his quota on a particular farm to sell the extra tobacco on excess pounds allotted to another farm within the same county. The marketing of a farm's excess tobacco on a card issued for a farm in another county, however, violates the regulations as a false identification of tobacco. *Id.* §§ 725.90, .95(b). It was this kind of violation that the [United States Department of Agriculture] agents ... were investigating.

*Winstead*, 708 F.2d at 925.

In *Winstead*, the agents pursued their undercover investigation by contacting Winstead, who was a tobacco warehouseman, on several occasions. One agent represented to Winstead that he was a new tobacco farmer who had not raised his quota for a farm in a certain county. *Id.* at 927. The agent asked Winstead if he could find someone with excess tobacco that could be sold on the agent's marketing card. Winstead agreed to try to help the apparent farmer. *Id.*

The agent returned to the warehouse on another day, and Winstead asked him if he had been approached by anyone. The agent said that no one had, and Winstead went over to a farmer in the warehouse. Winstead spoke to the farmer for about a minute, and the farmer thereafter approached the agent and entered into an illegal arrangement to market tobacco. *Id.* No evidence was presented at Winstead's trial as to what transpired during his conversation with the farmer. Later that day, as the agent was leaving the warehouse, Winstead directed another tobacco farmer to him and said " '[t]hat man can help you with pounds, I think.' " *Id.* The farmer approached the agent, and another illegal agreement was made.

Winstead was subsequently charged with aiding and abetting in the false identification and marketing of tobacco, in violation of Sections 2 and 1001 of Title 18, United States Code. After a jury trial, Winstead was convicted and he appealed on the ground that the Government failed to produce sufficient evidence to support the verdict. *Id.* at 926. The United States Court of Appeals for the Fourth Circuit reversed Winstead's conviction.

The *Winstead* court first held that to prove the crime of aiding and abetting the Government, at the outset, "must show that the defendant knowingly associated himself with and participated in the criminal venture." *Winstead*, 708 F.2d at 927 (citing *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949)); *see also Flowers v. Tandy Corp.*, 773 F.2d 585, 590 (4th Cir.1985) (citing with approval *Winstead*'s test for aiding and abetting). In addition, the *Winstead* court went on to state:

> To prove the element of association, the government must show that the defendant shared in the principals' criminal intent. This requires evidence that the defendant *be aware of the principals' criminal intent and the unlawful nature of their acts.* Evidence that the

defendant merely brought about the arrangement that made the criminal acts of the principals possible does not alone support a conclusion that the defendant was aware of the criminal nature of the acts.

*Winstead,* 708 F.2d at 927 (emphasis added and citations omitted).

The *Winstead* court used the test noted above and concluded that the Government had failed to prove that Winstead knew when he introduced the farmers to the agent of the parties' criminal intent to falsely identify tobacco. *Id.* The *Winstead* court explained what the Government should have attempted to prove:

To prove that Winstead knew [the farmers] intended to enter into illegal agreements with [the agent] when Winstead pointed [the agent] out to them, the government had to produce evidence that Winstead knew both the location of [the agent's] farm on account of which his marketing card was issued and the farms on which [the farmers] grew the tobacco they offered for sale. The jury could find that Winstead had knowledge of [the farmers'] criminal intent only if there was evidence that Winstead knew that their tobacco was grown in a different county than that from which [the agent's] farm was located and his card was issued. The government, however, failed to produce substantial evidence of such knowledge.

.... Certainly we cannot require that, without positive evidence to the contrary, a tobacco warehouseman must presume the illegality of all excess pounds transactions of which he becomes aware.

*Winstead,* 708 F.2d at 928.

Applying the standards enunciated in *Winstead* to the present case does not require this Court to set aside the jury's verdict. This Court is convinced that there was ample evidence produced at trial from which the jury could have reasonably concluded that Cody "knowingly associated himself with," *id.* at 927, Ammons and Martin in their criminal venture and participated in the venture. *Id.* at 927. It also appears to this Court that the present case is distinguishable from *Winstead* in the following respects. First, Cody did not merely introduce Ammons to Martin with the knowledge that Ammons had excess poundage to sell. Instead, Cody knew that Ammons, a well-known tobacco producer, was asking him to actually approach Martin, a tobacco warehouseman, with an offer to sell excess poundage. Although a legal transaction might have been structured from that bare offer, the jury could have reasonably inferred that Cody had knowledge of the illegal nature of the actual transaction from the low price that Martin offered Ammons for the excess poundage and from the unorthodox way the entire transaction was structured and pursued. *See United States v. Barnes,* 747 F.2d 246, 249 (4th Cir.1984) (selling tobacco by facially unorthodox procedures supports inference of illegality of tobacco transaction). Cody's role as middle-man or go-between provided him with ample opportunities to know the precise nature of his co-defendants' plan: He was in the thick of the entire arrangement and formed the necessary link; he did not merely introduce the two principal conspirators.

Second, Cody was not a warehouseman who might have been under competitive pressures to introduce farmers to each other in order to have legal transactions worked out. *See Winstead,* 708 F.2d at 929. The *Winstead* court was particularly concerned with the position Winstead was in when faced with farmers who had excess tobacco to sell. Winstead had expressed this precise concern:

You'll like, I say—all, I can tell ya [inaudible] so you'll—you'll—you'll just—I don't know nothing about this thing being a warehouseman—ain't supposed to participate in—ah—that activity when a man drives up in the damn door—if he's got a sale card and 'bacco I'm gonna sell his 'bacco.

*Winstead,* 708 F.2d at 929. The *Winstead* court noted that the regulations do not require a warehouseman to inquire into the proper identification of tobacco and that "it might be ruinous for one warehouseman [if he did make such an inquiry] if all others did not make the same inquiry." *Id.* Obviously, Cody was under no such pressure to refrain from inquiring into the nature of the transaction comtemplated and consum-

mated by Ammons and Martin. Cody has reminded this Court that he may have felt intimidated by Ammons, since Ammons was such an influential burley tobacco grower, and therefore would not have made any inquiry into the legality of the transaction pursued by Ammons. Cody, however, was not under the type of commercial pressure which concerned the *Winstead* court. If Cody did feel any latent intimidation, it is unfortunate for him that he gave into it.

In short, it appears to this Court that there was ample evidence from which the jury could infer that Cody knowingly associated himself with Ammons and Martin with knowledge of their unlawful plan and that Cody participated in the unlawful plan by relaying messages and packages between Ammons and Martin. Cody did far more than the defendant in *Winstead* to indicate his knowledge, and therefore his conviction shall stand.

### III

It now remains for this Court to assess, pursuant to Rule 33, both the *weight* of the Government's evidence and the overall fairness of Defendants' trial. This Court has carefully considered all of the testimony that was introduced at Defendants' trial and concludes that there was ample credible evidence to support their convictions. In addition, this Court believes that Defendants received a fair trial and that the interests of the justice would not be served by granting them a new trial.

### IV

Martin's argument concerning his Sixth Amendment rights is entirely without merit. This Court has previously considered such arguments raised by Defendants and has rejected them. As this Court has stated repeatedly, the trial of this conspiracy case was properly conducted within the Western District of North Carolina because overt acts in furtherance of the conspiracy took place within this district. It has been held many times that when " 'a conspiracy is comprised of many transactions in various districts, venue as to all conspirators is proper in *any* district in which *any* act in furtherance of the conspiracy was committed by *any* of the conspirators.' " *United States v. Anderson,* 611 F.2d 504, 509 n. 5 (4th Cir.1979) (emphasis added) (quoting *United States v. Whitaker,* 372 F.Supp. 154, 158 (M.D.Pa.), *aff'd without opinion,* 503 F.2d 1400 (3d Cir.1974), *cert denied,* 419 U.S. 1113, 95 S.Ct. 789, 42 L.Ed.2d 810 (1975)). *See generally* W. LaFave & A. Scott, *Handbook on Criminal Law* § 61, at 456 (2d ed. 1972) (citing *Hyde v. United States,* 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912)).

### V

This Court has also considered all of the other grounds raised by Defendants and finds them all entirely without merit. Martin and Cody received a fair trial and extremely lenient sentences. They are not entitled to a new trial.

### CONCLUSIONS

NOW, THEREFORE, IT IS ORDERED that Defendants' Motions for Judgment of Acquittal are *DENIED.*

FURTHER, IT IS ORDERED that Defendants' Motions for a New Trial are *DENIED.*

The Clerk is directed to certify copies of this Order to Defendants, defense counsel, the United States Probation Office, the United States Marshal, and the United States Attorney.