UNITED STATES of America, Appellee,

v.

**Billy Harold BARNES, Appellant.**

No. 83–5300.

United States Court of Appeals,
Fourth Circuit.

Argued June 6, 1984.

Decided Oct. 25, 1984.

Douglas E. Kingsbery, Raleigh, N.C. (Tharrington, Smith & Hargrove, Raleigh, N.C., on brief) for appellant.

Sidney M. Glazer, Atty., Dept. of Justice, Washington, D.C. (Samuel T. Currin, U.S. Atty., S. Johnson Howard, Asst. U.S. Atty., Raleigh, N.C., on brief) for appellee.

---

Before SPROUSE and CHAPMAN, Circuit Judges, and HALLANAN, United States District Judge for the Southern District of West Virginia, sitting by designation.

SPROUSE, Circuit Judge:

Billy Harold Barnes appeals his conviction of conspiracy to falsely identify and market 6,917 pounds of tobacco in violation of 18 U.S.C. § 371. He contends that there was insufficient evidence to convict him, that the jury viewed prejudicial material that was not in evidence, and that the trial court erred in refusing to allow him to present evidence tending to establish the existence of an illegal wiretap. Finding that the jury impermissibly viewed exhibits that were not in evidence, we reverse.

Barnes is a tobacco buyer in Dunn, North Carolina. He was convicted of conspiring with Walter L. Williamson and others to sell illegally tobacco that Williamson had grown in excess of his allotment. In October 1981, Barnes visited Williamson, who, together with his wife, owned and operated a large tobacco farm in adjacent Wilson County. During this visit William-

son asked Barnes if he could "move or sell or take care of" some excess tobacco which Williamson had grown that year—indicating that the amount involved was about 5,000 to 6,000 pounds. Barnes replied that he would be back in touch with Williamson with an answer, and a day or two later told him he could take care of the excess tobacco and would pay him fifty-five cents a pound for it. Williamson agreed, with the understanding that Barnes would later advise him when and where to deliver the tobacco. Barnes' son, Jeff, later came to the Williamson farm with information that the tobacco should be delivered to the New Dunn Warehouse in Dunn, North Carolina. Williamson replied that the tobacco was not yet ready for marketing. Barnes, Sr., the appellant, telephoned Williamson two days later inquiring whether he was still interested in moving the tobacco. Williamson said he was, but they fixed no time for delivery. That same night Williamson telephoned Barnes, Sr., who instructed him to have the tobacco in Dunn on Saturday morning, October 24, 1981, at 9:30 and that "Jeff [Barnes] or myself one will have to go with the tobacco. If not, they will not unload it."

Pursuant to this agreement, Jeff Barnes and Walter Williamson, Jr., met early on the designated Saturday and together drove a truck containing thirty-five "sheets" of tobacco to the New Dunn Warehouse in Dunn, Chatham County, where it was unloaded, weighed, and placed in the warehouse. The Williamson son did not display a tobacco marketing card and he was not given the customary sale bill. The New Dunn Warehouse was not designated on any of the Williamsons' marketing cards and, in fact, the tobacco was marked with tags from other warehouses that were designated on the Williamsons' marketing card. The tobacco weighed 6,917 pounds and was later sold at the New Dunn Warehouse for $10,961.99 on marketing cards of

R.D. Lee Farms, Inc.* A short time later, Barnes, Sr., visited Williamson, Sr., again and paid him $3,800 in cash, their agreed price of fifty-five cents per pound.

The manner in which the evidence against Barnes was gathered forms the core of much of the dispute underlying this appeal. Most, if not all, of this evidence was developed prior to the contracted sale of Williamson's excess tobacco and was generated by the Williamsons' domestic problems.

During the time period encompassing the Williamson-Barnes tobacco transaction, Williamson and his wife, Retha Williamson, were experiencing marital difficulties. The loyalties of the Williamsons' two children apparently were divided. The son, Walter, Jr., sided with his father, and a married daughter, Kathy Ganskop, who lives at another house on the farm, sided with her mother. Retha Williamson placed a wiretap on the Williamsons' telephone and recorded the conversations between Williamson and Barnes. She advised her daughter of the Barnes/Williamson telephone conversation, informing her that she was suspicious that the two men might be in the process of illegally selling tobacco. Ganskop observed the sons of the two men loading the tobacco and followed the truck that Jeff Barnes and Walter Williamson, Jr., drove to the New Dunn Warehouse. The following Monday, she returned to the warehouse and found the tobacco that had been delivered from her parents' farm. She then disclosed the information she had gathered to an investigator for the Department of Agriculture.

Billy Harold Barnes, Jeff Barnes and R.D. Lee Farms, Inc., were indicted on two counts for falsely identifying and marketing tobacco and for conspiring to falsely identify and market it in violation of 18 U.S.C. §§ 1001 and 371. Walter Williamson, Sr., was named as an unindicted co-

---

* The evidence concerning the sale on the marketing card of R.D. Lee Farms, Inc. was conflicting and co-indictee R.D. Lee Farms, Inc. was acquitted of the conspiracy accusation. Considering the evidence in a light most favorable to the government, however, *Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978), there was sufficient evidence to uphold a jury finding that the tobacco was marketed on the Lee Farms cards.

conspirator. He pled guilty to the conspiracy charge pursuant to a plea bargain and testified as the principal government witness. As provided in the plea bargain, no charge was brought against his son Walter, Jr., who likewise testified as a government witness. Billy Harold Barnes, Jeff Barnes and R.D. Lee Farms, Inc. were tried by a jury. The trial court granted a motion acquitting Jeff Barnes at the conclusion of the government case. The jury acquitted R.D. Lee Farms, Inc. Billy Harold Barnes was found not guilty of the substantive offense, but guilty of the charged conspiracy.

■ We agree with the government that we would be required to affirm the jury verdict if the only question was the sufficiency of the evidence. In considering the sufficiency of the evidence, we must sustain the judgment based on a jury verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision. *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Barnes argues that the evidence was insufficient to convict him because the government proved only an agreement between Barnes and Williamson—not an illegal agreement.

■ It is, of course, not necessary to prove the existence of an illegal agreement by direct evidence. Rather, a common purpose and plan may be inferred from all the circumstances. *Glasser, supra; United States v. Beecroft*, 608 F.2d 753 (9th Cir. 1979); *United States v. Dominguez*, 604 F.2d 304 (4th Cir.1979), *cert. denied*, 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980); *United States v. Evans*, 572 F.2d 455 (5th Cir.1978); *United States v. Lowry*, 456 F.2d 341 (5th Cir.1972); *United States v. Morado*, 454 F.2d 167 (5th Cir.1972); *United States v. Godel*, 361 F.2d 21 (4th Cir.1966). Moreover, the government need not establish that each conspirator had knowledge of all phases and details of the conspiracy, but only that the defendant participated in the conspiracy with knowl-

edge of the essential nature of the plan. *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947).

■ It is true that Williamson never, by express words, asked Barnes to sell his surplus tobacco in violation of the law and regulations controlling the sale of tobacco. There was evidence, however, from which the jury could infer that illicit purpose: Williamson asked Barnes to "move or sell or take care of" tobacco which he identified as in excess of his allotment; the two men thereafter engaged in at least two vaguely phrased telephone conversations agreeing to sell the tobacco by procedures which were facially unorthodox; the younger Barnes and Williamson delivered the tobacco, without a receipt or marketing card, to a warehouse where Williamson could not legally sell tobacco; both Williamson and Barnes were experienced in growing and selling tobacco and both realized that Williamson's tobacco was in excess of his allotment; the tobacco was on the marketing card of another farm authorized to sell at that warehouse; and Barnes paid Williamson in cash without a bill of sale or any accounting for the amounts sold or the balance of the sales price at the market.

Barnes argues, however, that this evidence could support inferences of agreements to sell in a number of ways which could have been legal. This may be true—but the test is not whether the evidence would have supported another inference, but whether the evidence would have supported the inferences gleaned by the jury. We think it can, and if this were the only error assigned, would affirm the conviction.

We think, however, that there is merit to the contention advanced by Barnes that he was prejudiced by the jury's view of material that was not in evidence.

The court received three exhibits, out of the presence of the jury, during a hearing on Barnes' motion to suppress the exhibits and other evidence obtained as a result of the wiretap. The documents, Exhibits 2, 3, and 5, were presented for that hearing,

identified, and lodged in the record, but were neither offered nor admitted into evidence. They were sent accidentally to the jury with regularly admitted exhibits.

The extent to which the jury reviewed the exhibits is not certain, but it is clear that some of the evidence contained in the exhibits was brought to their attention. Exhibit 2 was a cassette tape of the initial Barnes/Williamson telephone conversation, recorded by Retha's telephone wiretap. Printed on Exhibit 2 were the names W.L. Williamson, Sr., and Billy Harold Barnes with the date 10–22–81, the date on which Williamson testified that the telephone conversation took place. Exhibit 3 was a typed transcript of that telephone conversation, identified on the outer cover by description. The third exhibit, Exhibit 5, was a sworn statement of Retha Williamson, in part corroborating the testimony of her daughter, and stating that, while wearing a body recording device, she recorded her husband's admission that he sold the tobacco illegally at the New Dunn Warehouse. Retha Williamson did not testify at the trial.

After deliberating for approximately one and one-half hours, the jury forwarded a written note to the court: "Are we allowed ... to consider defendants' exhibits 2, 3, and 5? These were not presented to us during the trial." The court recalled the jury, received the three exhibits from them, and asked the jury if they had considered the exhibits. The foreman of the jury replied, "No, sir, we have looked at it but we have not discussed it. . . ." The court inquired if they had read Exhibits 3 and 5, and the jury foreman replied, "The phone call conversation [Exhibit 3] is the one we have read." The court asked the foreman if the jury had read the statement (Exhibit 5) and he responded, "No, sir, we have some questions about it." He indicated that they had not listened to Exhibit 2 (the recording of the telephone conversation). The court then inquired if there were any members of the jury who could not consider the other evidence in the trial without eliminating from their minds the information brought to their attention by Exhibits 2, 3, and 5. There was no response from the jury. The court then instructed them not to consider Exhibits 2, 3, and 5 and directed the jury to continue its deliberations.

The government argues that Barnes was not prejudiced by the jury having received and partially viewed the three unauthorized exhibits. We cannot agree. It is, of course, impossible to know the full impact that the exhibits might have had on the jury. The unrebutted evidence displayed clearly on the face of Exhibit 3, however, was that a telephone conversation between Barnes and Williamson took place on the date pinpointed by Williamson's testimony. The tenor of Barnes' defense was that there had not been such a conversation so Williamson's credibility was a key issue. Exhibit 5, if read, could have been even more prejudicial, and from the jury foreman's response we cannot conclude that it was not read at least in part. One cannot but wonder how the jury could have formulated questions about Retha's statement if they had no knowledge of the contents.

The government further contends that, even if the jury was aware of some of the information, Barnes cannot benefit from that error because his counsel did not object when the exhibits were sent to the jury room. The government misconstrues the record. Defense counsel was unaware that the exhibits were sent to the jury room. He objected and moved for a mistrial as soon as this information was brought to his attention.

If prejudicial evidence that was not introduced at trial comes before the jury, the defendant is entitled to a new trial. *Paz v. United States*, 462 F.2d 740 (5th Cir.), *cert. denied*, 414 U.S. 820, 94 S.Ct. 47, 38 L.Ed.2d 52 (1972); *Dallago v. United States*, 427 F.2d 546 (D.C.Cir.1969); *United States v. Adams*, 385 F.2d 548 (2d Cir.1967). The general standard for determining if the evidence is prejudicial is whether there is "a reasonable possibility that the jury's verdict was influenced by the material that improperly came before it." *Llewellyn v. Stynchcombe*, 609 F.2d 194 (5th Cir.1980); *United States v. Vasquez*, 597 F.2d 192 (9th Cir.1979). Further-

more, there is a presumption of prejudice where such improper evidence has been made available to the jury, and the burden is on the government to prove that it is harmless. *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); *United States v. Bassler*, 651 F.2d 600 (8th Cir.1981); *United States v. Howard*, 506 F.2d 865 (5th Cir.1975).

Even if inadvertent, sending the unauthorized Exhibits 2, 3, and 5 to the jury during their deliberation was error. The information available to the jury makes it highly unlikely that Barnes received a fair trial. Accepting even the foreman's cryptic version of the extent to which the jury was exposed to the information contained in the exhibits, we feel it likely that Barnes was prejudiced. Inferring what logically would have been developed if the district court had conducted a more detailed examination of the jury, it is highly unlikely that Barnes could have received fair consideration by the jury. At a minimum, it cannot be said that the government carried its burden of proving the error non-prejudicial.

We reverse and remand for a new trial for the above reasons, and do not reach Barnes' final contention that the court erred in refusing to consider evidence that the wiretap was illegal.

REVERSED.