848 F.2d 484
 46 Fair Empl.Prac.Cas. 1723,
46 Empl. Prac. Dec. P 38,032
Marion STEPHENS, Jr., Plaintiff-Appellee,
v.
SOUTH ATLANTIC CANNERS, INC. (COCA COLA COMPANY); Edward T.
Mizell, General Manager; Rance Medlin,
Supervisor; Junior Hopkins, Supervisor,
Defendants-Appellants.
 No. 87-2605.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 7, 1988.
Decided June 8, 1988.
 
 Charles T. Speth, II (Vereen A. Dennis, Robert S. Phifer, Haynsworth, Baldwin, Miles, Johnson, Greaves & Edwards, P.A., on brief), for defendants-appellants.
 Stuart W. Snow (Richard G. Dusenbury, Dusenbury & Snow, P.A., on brief), for plaintiff-appellee.
 Before WILKINSON and WILKINS, Circuit Judges, and MacKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 WILKINS, Circuit Judge:
 
 
 1
 Marion Stephens, Jr. charged the Defendants with race discrimination. On his claim under 42 U.S.C.A. Sec. 1981 (West 1981), the jury awarded compensatory damages in the amount of $100,000.00 and punitive damages in the amount of $85,000.00. The court subsequently entered judgment on his Title VII claim awarding no additional monetary relief and denying any other potential relief, an order from which Stephens does not appeal.
 
 
 2
 South Atlantic Canners, Inc. and its named supervisory employees (South Atlantic) appeal from the court's denial of their motions for judgment notwithstanding the verdict and for a new trial. While numerous issues are raised by South Atlantic, only two merit discussion. First, we consider whether the trial judge applied the correct standard in assessing the impact on the jury of extraneous material which was improperly submitted to it. Second, we address whether, under the particular facts of this case, the issue of punitive damages was properly submitted to the jury. We reverse and remand for a new trial consistent with this decision.
 
 I.
 
 3
 This court in Haley v. Blue Ridge Transfer Co., 802 F.2d 1532 (4th Cir.1986), set forth the proper analysis to be followed when allegations of extraneous juror contact arise. Under Haley, where the evidence proffered to impeach the verdict is juror testimony, the court must first determine whether the testimony is competent pursuant to Federal Rule of Evidence 606(b).[1] If there is competent evidence demonstrating extraneous contacts, the court must invoke a presumption of prejudice if the contacts are "more than innocuous interventions." Id. at 1537 n. 9. Following the invocation of the presumption, a heavy burden then shifts to the prevailing party to convince the court that there is not "a reasonable possibility that the jury's verdict was influenced by an improper communication." Id. at 1537 (footnote omitted) (citing United States v. Barnes, 747 F.2d 246 (4th Cir.1984)); see also United States v. Greene, 834 F.2d 86 (4th Cir.1987). Applying this three-step analysis to the facts before us, we hold that the district court erred in failing to invoke the presumption of prejudice based on the extraneous material which was indisputably submitted to the jury. And, since there is a reasonable possibility that the extraneous material improperly influenced the jury's verdict, we remand for a new trial.
 
 A.
 
 4
 South Atlantic is engaged in the business of making canned soft drinks for franchisees of Coca-Cola, USA. Stephens was hired by South Atlantic in June, 1978 as a part-time truck driver and subsequently was promoted to full-time driver. He worked in this capacity until his discharge in September 1982. South Atlantic maintains that Stephens was discharged for grossly unsatisfactory job performance as demonstrated by his performance record. While Stephens does not deny that he had a poor performance record, he maintains that several white truck drivers had similar poor performance records and yet they were not discharged.
 
 
 5
 Personnel records of various white truck drivers were offered by Stephens at trial to support the crux of his discrimination claim. Prior to trial and during a recess, the litigants' attorneys laboriously examined proposed exhibits, including the personnel records which South Atlantic had delivered to Stephens' attorney. Copies of these personnel records were made and compared to avoid confusion at trial, to provide the attorneys an opportunity to frame objections, and to avoid the necessity of suspending testimony in order that counsel might examine each document when offered into evidence. After trial, South Atlantic discovered that several exhibits introduced by Stephens had been altered.
 
 
 6
 Plaintiff's exhibits 82 and 83 were South Atlantic's personnel files of two white truck drivers, Phil Stokes and Wayne Barrineau. In these files were found yellow stickers with the name of the employee and the words "No difference" written on them.[2] South Atlantic was unaware that after the exchange and inspection of exhibits these stickers were added to the files which Stephens presented to the court and jury.
 
 
 7
 South Atlantic argued before the district court and now before us that the stickers placed in copies of the personnel files could reasonably suggest to the jury that a determination had been made that there was no material difference between the performance records of Stephens and the white truck drivers, Stokes and Barrineau. In determining whether the presumption of prejudice should be invoked, the district court considered this interpretation but found that "[i]t seems just as likely, if not more so, that the jury might interpret the note to mean 'no difference' in disciplinary treatment considering the employee's performance." The district court thus erroneously attempted to balance two competing interpretations before finding that the latter "seemed more likely." This was not a correct application of the governing rule; unless the extraneous material is innocuous, the presumption of prejudice must be invoked.
 
 
 8
 Plaintiff's exhibit 85 was a copy of South Atlantic's personnel file of another white driver, Allan Brazzell. Two of the documents in this file were reports of disciplinary action short of discharge which had been taken against him. On both documents were written, "Don't have this in our file." Stephens' attorney initially maintained that the only logical explanation for this was that one of his assistants wrote this on the originals after they were delivered by South Atlantic's attorneys as a reminder to make copies. However, at the post-trial hearing Stephens' attorney conceded that the notations were not written on the originals. And, an examination of this exhibit by this court shows that the notations were written on the copies after they were made.
 
 
 9
 Stephens' attorney repeatedly claimed during the trial before the jury and during closing argument that South Atlantic had not been forthcoming with all of its records and that pertinent documents from the personnel files of the white drivers had been withheld. South Atlantic contended that these notations bolstered this false charge and could have reasonably affected its credibility in the eyes of the jury. The trial judge concluded that since Stephens offered this exhibit it is difficult to see how the jury could have concluded that South Atlantic had attempted to "hide" it. He found that the jury "most probably concluded that the notes were for clerical housekeeping" purposes.
 
 
 10
 Finally, the parties examined computer printouts (Exhibits 72-80) from the South Carolina Department of Highways and Public Transportation which showed summaries of the driving records of each of the white drivers. After the printouts were authenticated, South Atlantic offered no objection. When these printouts were submitted to the jury, attached to them without defense counsel's knowledge were the actual traffic tickets and accident reports which provided a basis for the summaries on the printouts. These attachments showed charged violations which were more serious than the actual dispositions shown on the summaries and contained narratives of investigating officers and sketches of accidents. The computer printout detailing Stephens' driving record did not have these attachments. The district court found that the submission of these documents was "not inconsistent with substantial justice."
 
 B.
 
 11
 In Haley, an individual called for jury service was inadvertently placed on a jury panel on which he had not been selected to serve. He remained seated on the jury for a full day, hearing the opening statements and the testimony from one of the plaintiff's witnesses. The error was discovered at the day's conclusion and the individual was removed from the jury.
 
 
 12
 Following a 12-day trial and a verdict for the plaintiff, the defendants moved for a new trial on the basis of several prejudicial remarks made by the individual who had improperly sat with the jury. One of the jurors averred that during a court recess on the first day of trial the individual stated that he knew from his own experience that the plaintiff's testimony was correct and that he would vote to return a verdict against the defendants.
 
 
 13
 After finding that the district court had correctly considered the juror's affidavit under Rule 606(b), this court held that the district court erred in not invoking a presumption of prejudice arising from the extraneous contact, stating:
 
 
 14
 Courts have generally applied the presumption of prejudice automatically after there has been an unauthorized communication to the jury. (Citations omitted.) We recognize, however, that certain kinds of extrajudicial contacts may amount to nothing more than innocuous interventions that simply could not justify a presumption of prejudicial effect. See, e.g., Dennis v. General Electric Corp., 762 F.2d 365, 367 (4th Cir.1985). But the communication in this case surely cannot be characterized as innocuous and we must proceed from the presumption of prejudice.
 
 
 15
 Haley, 802 F.2d at 1537 n. 9.
 
 
 16
 Stephens contends that the altered exhibits do not trigger the presumption of prejudice because they fall within the category of innocuous extraneous contacts discussed in Dennis. In Dennis, this court refused to order a new trial based on an alleged improper communication. Early in the trial, the jury sent to defense counsel, through the courtroom clerk, a comic strip cartoon about lawyers. During his closing argument, without objection by the plaintiff, defense counsel referred to the cartoon as an example of the events they had experienced together.
 
 
 17
 As noted in Haley, there is an infinite variety of possible extrajudicial juror communications and courts cannot anticipate those which could potentially prejudice the factfinder. 802 F.2d at 1537 n. 11. But, it is clear that extraneous material which reached the jury here did not fall into the category identified in Dennis. Proper application of the Haley test compels a presumption that these extraneous materials were prejudicial.
 
 C.
 
 18
 The final prong of the Haley analysis calls for an examination into whether rebuttal evidence offered by the prevailing party established the lack of "a reasonable possibility that the jury's verdict was influenced by an improper communication." Haley, 802 F.2d at 1537. This standard imposes a heavy burden on the prevailing party and also narrows the discretion provided to the district court. Id. at n. 11.
 
 
 19
 While perhaps any one of these extraneous materials, standing alone, would not result in a determination that there was a reasonable possibility that the jury was improperly influenced, in combination, the conclusion is inescapable. The jury understood that exhibits 82 and 83 were duplicates of South Atlantic's personnel files which it had supplied to Stephens' attorney during discovery. A reasonable possibility exists that the jury concluded that the stickers were placed there by South Atlantic believing that South Atlantic, although denying disparate treatment at trial, had earlier concluded that Stephens, Barrineau and Stokes did not have materially different employment records.
 
 
 20
 The district court found that the jury most probably concluded that the notation "Don't have this in our file" was affixed to the reports of disciplinary action in Allan Brazzell's personnel file for "housekeeping purposes." However, an equally reasonable possibility is that the jury concluded that these two documents which dealt with the central issue at hand had been initially withheld by South Atlantic because they were damaging to its case. The impression that South Atlantic had not dealt fairly and honestly with Stephens' attorney could have reasonably influenced the jury's assessment of South Atlantic's overall credibility, particularly in light of the strategy of Stephens' attorney who asserted on numerous occasions during the trial that South Atlantic had not furnished complete personnel files of the white drivers. The majority of these references occurred in the presence of the jury and some constituted explicit accusations. For example, Stephens' attorney stated in the presence of the jury, "I think there are a lot of them [personnel documents] missing." At another point in the trial he stated that he possessed "what they [South Atlantic] alleged to be the complete records ... of the drivers involved." (Emphasis added.) Again, while conducting direct examination of a witness, Stephens' attorney stated that the case should not be "limited to what the defendant saw fit to furnish us." Even though the court admonished counsel for making "an improper statement," Stephens' attorney continued to infer that South Atlantic had withheld personnel documents. In his examination of South Atlantic's general manager, Stephens' attorney showed the witness an exhibit and stated that it was "purport[edly]" the complete file. And, during his closing argument, he referred on at least two occasions to the fact that he believed the files were incomplete.
 
 
 21
 Finally, with regard to the attachments to the computer printouts, while they may be the least offensive of the extraneous material, without question they emphasized the poor driving records of the white drivers against whom Stephens compared himself and more importantly allowed the jury to consider the statements and opinions of investigating officers who were not produced as witnesses and subjected to cross-examination. The question is whether at South Atlantic's motion for a new trial Stephens produced rebuttal evidence or explanation so that one may conclude that there does not remain a reasonable possibility that the extraneous material improperly influenced the jury. When considered collectively and analyzed in light of the presentation of Stephens' case, we are compelled to answer no.
 
 
 22
 It is unfortunate when new trials are required. But the additional investment of time and resources is justified when the integrity of a verdict is so obviously rendered suspect because the jury considered extraneous material which was not properly admitted into evidence. This is required even when the contact occurs by inadvertence on the part of one of the litigant's attorneys. Unable to project ourselves back into the jury room or peer into the jurors' minds, we must objectively examine the extraneous material in light of the circumstances of the case and the impact it may reasonably have had. Applying the Haley test, we find the district court erred in denying South Atlantic's motion for a new trial.
 
 II.
 
 23
 In his amended complaint, Stephens sought back pay, compensatory damages, an injunction, declaratory relief, and punitive damages. The jury's finding of liability on the part of South Atlantic does not necessarily entitle Stephens to all of his requested relief, for the determination of which remedies are appropriately available depends on the particular facts of each case.
 
 
 24
 Stephens alleged that South Atlantic violated both Title VII and section 1981. These provisions, while requiring proof of similar elements to establish a prima facie case, operate independently and allow separate and distinct remedies. Johnson v. Railway Express Agency, 421 U.S. 454, 459, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975). Claimants proceeding under Title VII, which provides equitable relief, are generally limited monetarily to an award of back pay. Keller v. Prince George's County, 827 F.2d 952, 955 (4th Cir.1987). Injunctive relief is also available in certain Title VII actions, and this equitable award may be appropriate even in the absence of an award of back pay. Evans v. Hartnett County Bd. of Educ., 684 F.2d 304, 306 (4th Cir.1982). Successful Title VII claimants may also be reinstated to their former position or its equivalent if such relief is warranted. Pecker v. Heckler, 801 F.2d 709, 711-12 (4th Cir.1986).
 
 
 25
 In comparison, an action pursuant to section 1981 entitles the plaintiff to "both equitable and legal relief, including compensatory, and under certain circumstances, punitive damages." Johnson, 421 U.S. at 460, 95 S.Ct. at 1720. The granting of injunctive relief for a section 1981 violation turns on the particular facts of each case. Williams v. State University of New York, 635 F.Supp. 1243 (E.D.N.Y.1986). Likewise, not every action under section 1981 warrants an award of punitive damages. Beauford v. Sisters of Mercy-Province of Detroit, Inc., 816 F.2d 1104, 1109 (6th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 259, 98 L.Ed.2d 217 (1987); Jones v. Western Geophysical Co., 761 F.2d 1158, 1162 (5th Cir.1985).
 
 
 26
 Punitive damages are recoverable for conduct exhibiting malice, an evil motive, or recklessness or callous indifference to a federally protected right. Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 362 (1983). It is an extraordinary remedy and is designed to punish and deter particularly egregious conduct. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 268, 101 S.Ct. 2748, 2760, 69 L.Ed.2d 616 (1981). Although any form of discrimination constitutes reprehensible and abhorrent conduct, not every lawsuit under section 1981 calls for submission of this extraordinary remedy to a jury. Beauford, 816 F.2d at 1109.
 
 A.
 
 27
 The trial record demonstrates that Stephens received a total of 17 verbal and written warnings in the three years preceding his termination. Although Stephens disputed the existence of several of these warnings, even he admitted that his record was less than "exemplary." He received multiple warnings for tardiness and for continually leaving late for scheduled deliveries. Many of these warnings involved instances where he was more than two to three hours late in making previously scheduled deliveries. On one particular occasion when he was late with a delivery, one of South Atlantic's largest customers had a special display planned which was to be televised nationally by the Coca-Cola Company. The irate customer contacted South Atlantic and threatened to withdraw the account. South Atlantic General Manager Edward T. Mizell testified that loss of this account, which constituted 25% of the company's business, would have resulted in the shutdown of the entire second shift of the company's work force.
 
 
 28
 South Atlantic also received complaints from two motorists about Stephens' unsafe driving. One of these complaints was received in March 1982, approximately four months prior to Stephens being placed on 60-day probation after yet another citation for leaving late. Another complaint was made about Stephens' unsafe driving just prior to his being placed on probation. In this instance, a motorist contacted law enforcement authorities with the number of a Coca-Cola truck which the motorist claimed had forced her vehicle off the road. An investigation revealed that Stephens was driving the truck when this occurred. At the time Stephens received this warning and also when he was placed on probation the following week, South Atlantic proposed to Stephens that he take some time off to get his affairs in order and resolve any personal problems which might be affecting his job performance. Stephens was also informed at this time that another incident could result in his dismissal.
 
 
 29
 Approximately two weeks after being placed on probation, Stephens was involved in a heated argument with the manager of a customer's plant while making a delivery. After Stephens left the plant, the manager telephoned South Atlantic and requested that they not dispatch Stephens to his plant on future occasions. Despite the earlier warning, South Atlantic elected not to discharge him.
 
 
 30
 Immediately after Stephens' probation ended, he negligently drove a South Atlantic truck into the rear of another vehicle resulting in $60,000.00 damage to the company truck. After this accident, which resulted in Stephens being charged with a moving violation, he was finally discharged by South Atlantic.
 
 B.
 
 31
 Comparison of all the personnel files introduced at trial leads to the inescapable conclusion that Stephens possessed the poorest performance record of all the drivers. While several white drivers had poor records, overall Stephens undoubtedly had the worst.
 
 
 32
 In none of the other drivers' files is there exhibited the combination of negative factors evidenced in Stephens' case, particularly (1) a history of major and minor accidents, (2) customer and citizen complaints, (3) repeated warnings for leaving late for deliveries and other performance problems, and (4) a complete lack of responsiveness to valid criticism of job performance. Further, in many of these cases the files demonstrate disciplinary action by South Atlantic against the drivers which was commensurate with action against Stephens for comparable infractions.
 
 
 33
 Stephens claimed that even if this were true, his record was not worse than white drivers in certain categories, e.g., number of serious accidents. For example, he asserted at trial that a comparison of his job performance record with the record of Adam Baker reveals discrimination because he was terminated by South Atlantic while Baker was allowed to remain with the company. Baker was involved in one serious accident and several minor ones.[3] The serious accident in which Baker was involved did result in disciplinary action against him, albeit short of discharge. Further examination of Baker's record shows that, unlike Stephens, Baker received no complaints from customers or citizens. He also received significantly fewer warnings for tardiness and leaving late, and his performance improved after he was informed that his employment was in jeopardy. While he and Stephens had equally poor job performance in the category of serious accidents, his overall record was much better than Stephens'.
 
 
 34
 Stephens also attempted to prove discrimination by a comparison of his record with that of white driver Allan Brazzell. Brazzell's personnel record demonstrates that in addition to several minor traffic accidents, he was suspended for two weeks without pay and placed on six-month probation after it was discovered that he left the company grounds without first allowing inspection of his vehicle by a security guard. Approximately three years after this incident, Brazzell was warned by the company that an additional accident or violation in the next 12 months could result in his termination. Brazzell quit his job at South Atlantic soon after this warning. Examination of Brazzell's personnel file also reveals that he had only one warning for tardiness which had been subsequently excused. Brazzell's file contained no warnings for leaving late for deliveries, nor were there any documents demonstrating citizen or customer complaints.
 
 
 35
 The personnel records of white truck driver Gene Smith were also introduced in an attempt to show disparate treatment. These records show that Smith was discharged by South Atlantic after approximately eight warnings for leaving late for deliveries. Smith was subsequently rehired as a part-time driver for the busy summer season after he admitted the violations and informed South Atlantic that he accepted full responsibility for his poor performance record.
 
 
 36
 Stephens also introduced the employment record of Phil Stokes, another white driver at South Atlantic. Stokes' personnel file shows five warnings for various matters, including one warning excused due to Stokes' illness. He was discharged by South Atlantic without any warning or being given another chance through probation after it was discovered that he had violated the company policy against having an unauthorized passenger in a South Atlantic vehicle.
 
 
 37
 The personnel record of white truck driver Jimmy Gainey was also presented by Stephens to substantiate his discrimination claim. Gainey's file shows an attendance problem, but does not reveal any of the other performance problems experienced by Stephens. The personnel records of Gainey demonstrate that his performance improved after he was informed that he was in danger of losing his job.
 
 
 38
 Finally, Stephens introduced the personnel files of several other South Atlantic drivers, including Wayne Barrineau and Eddie Owens. Examination of these files clearly reveals that neither of these drivers possessed performance records as poor as Stephens'. They had not been involved in any serious accidents and they had not triggered any customer or citizen complaints to South Atlantic. The personnel records of Barrineau and Owens also reveal a minimal number of warnings for tardiness and leaving late for deliveries.
 
 C.
 
 39
 In ruling on South Atlantic's post-trial motions,[4] the district judge noted that he believed that South Atlantic "had every right to fire the plaintiff." He further emphasized that he was "shocked by the verdict" and felt that "everybody in the courtroom was shocked ... when it came out."[5]
 
 
 40
 The district judge, however, refused to grant South Atlantic's motion for judgment notwithstanding the verdict, stating that "[t]he files also could be viewed by the jury, if they chose to, in isolation of a particular type infraction." He therefore denied South Atlantic's motion despite his well-founded conclusion that Stephens has "the worst record of any of the drivers that any testimony has been offered about."
 
 
 41
 Although we cannot say that the district court was in error in submitting the issue of compensatory damages to the jury, our detailed review of the proceedings reveals no evidence which would support an award of punitive damages.[6] An objective reading of the record shows that Stephens had been warned on approximately 17 different occasions about violations of company rules. He came very close to jeopardizing the business relationship his employer had with a major customer. Another customer had requested that the delivery schedule be changed so that Stephens would not make deliveries to his place of business. Two motorists on two separate occasions made the effort to report what they considered reckless driving on the part of Stephens while he was driving a company truck. He was offered the opportunity to take some time off to resolve any personal problems causing his deficient performance. And, rather than being discharged, he was placed on probation. Finally, after causing $60,000.00 damage to a company vehicle, he was discharged. Against these facts, the extraordinary remedy of punitive damages is not appropriate.
 
 III.
 
 42
 We reverse and remand for a new trial consistent with this opinion.
 
 
 43
 REVERSED AND REMANDED.
 
 
 
 [1]
 Rule 606(b) generally does not allow juror testimony to be used to impeach a jury verdict, but it does allow such testimony to prove that extrajudicial, prejudicial information influenced the verdict. See generally Tanner v. United States, 483 U.S. ----, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). We need not engage in an analysis pursuant to Rule 606(b) because here it is undisputed that extraneous material was submitted to the jury
 
 
 [2]
 One yellow sticker was discovered in Stokes' file and two in Barrineau's
 
 
 [3]
 Disciplinary action generally was not taken against any driver involved in an accident which resulted in minor property damage
 
 
 [4]
 We note that the district judge had earlier stated that he questioned "whether there is enough too [sic] get the case to the jury on the issue of discrimination," and further, that he had "some serious reservations about whether the plaintiff ha[d] established a prima facie case."
 
 
 [5]
 The district judge also emphasized during the post-trial proceedings that he was convinced that Stephens had falsified driving logs representing his total mileage driven during the final days of his employment. Dismissing the idea that "this is the type thing that happens in a ten day trial," the court added:
 It's not the type thing that happens in a career of trials, because people simply do not falsify records in courts of law, and they are not supposed to do it, and it is not tolerrated [sic], and that was done in this case, and there's not but one reason for which it could be done. If I had been on the jury, that one factor, along with several others, would have caused me to question the credibility of Mr. Stephens.
 
 
 [6]
 This is not to say that the issue of punitive damages may not be submitted to a jury on retrial if Stephens presents additional, competent evidence of "the requisite malice or reckless or callous indifference of an egregious character." Beauford, 816 F.2d at 1109