19 F.3d 1430
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellant,
v.
Jefferson Marion LONG, Jr., a/k/a Bud, Defendant-Appellee.
 No. 92-6799.
 United States Court of Appeals, Fourth Circuit.
 Feb. 25, 1994.
 
 1
 Appeal from the United States District Court for the District of South Carolina, at Columbia. Falcon B. Hawkins, Chief District Judge. (CR-91-384)
 
 
 2
 Alfred William Walker Bethea, Jr., Asst. United States Atty., Florence, South Carolina, for Appellant.
 
 
 3
 Thomas Casey Brittain, George M. Hearn, Jr., Hearn, Brittain & Martin, P.A., Conway, South Carolina, for Appellee.
 
 
 4
 John S. Simmons, United States Atty., Florence, South Carolina, for Appellant.
 
 
 5
 D.S.C.
 
 
 6
 AFFIRMED.
 
 
 7
 Before RUSSELL and WIDENER, Circuit Judges, and CLARKE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 
 OPINION
 PER CURIAM
 
 8
 The government appeals an order of the district court granting the defendant, Jefferson Marion Long, a new trial pursuant to Federal Rule of Criminal Procedure 33. The sole issue before us is whether the district court properly granted Long a new trial where tapes, which were taken to the jury room and which were conditionally admitted as evidence of a conspiracy (co-conspirators' statements), became impermissible hearsay when the court granted an acquittal on the conspiracy count. The government argues that a new trial was not necessary because the evidence was properly before the jury as background evidence on the substantive count or, in the alternative, any error was harmless. We agree that it was prejudicial error for the jury to have the tapes before it during deliberations on the remaining substantive count where a prima facie conspiracy had not been proven and no curative instruction was given.[1] We affirm.
 
 I.
 
 9
 The charges against Senator Long arose out of "Operation Lost Trust", a Federal Bureau of Investigation (FBI) sting operation targeted at the South Carolina General Assembly during the 1990 term. See generally United States v. Bailey, 990 F.2d 119 (4th Cir.1993), for background. The FBI began the operation after receiving information that certain members of the Legislature were involved in illegal drug activity and public corruption. We limit the facts to events involving Senator Long.[2] In April 1989 Ron Cobb, a powerful lobbyist and former state legislator, agreed to cooperate with the government after he was arrested in a drug sting. In order to investigate allegations of legislative extortion, the FBI devised a plan in which Cobb would pose as a lobbyist representing a group of wealthy investors who wanted to see a parimutuel betting bill passed in South Carolina. Cobb was to solicit support, in return for money, from those legislators he had paid off in the past and those who voluntarily approached him. Audio and videorecording equipment was set up in Cobb's office and in his room at the Town House Hotel where most of the Legislature stayed and conducted a great deal of informal lobbying. Cobb wore a body recorder when live monitoring was not possible.
 
 
 10
 House member Bob Kohn accepted a bribe from Cobb early on in the sting and in an April 26, 1990 audio and videotaped meeting Cobb urged Kohn to solicit the support of members of the Senate Judiciary Committee in order to get the bill out of the committee and into the full Senate. Long was mentioned as someone who might support it. Several days later in another taped conversation with Cobb on May 1, 1990, Kohn offered to talk to Bud Long and Rick Lee, both members of the Senate Judiciary Committee. Trial testimony conflicted as to what was actually said during Kohn's May 1 afternoon meeting with Long. On May 2, Kohn reported to Cobb in an audiotaped conversation that he had spoken to Long. During the week of May 8th, Cobb and Kohn met with Lee and offered him money to get the bill out of Long's committee. Lee then took an informal poll to gauge support. Cobb testified that Long approached him just a few days later on May 10. He reported this to the FBI and was authorized to tape Long. On the morning of May 17th Long summoned Cobb to the Senate. An audiotape of this meeting was introduced at trial. The government contended that during this conversation Long requested $2800.00 to make his house payment in return for his vote on the parimutuel bill. Long argued, and was supported by Cobb's testimony, that he had already cast his vote on the bill and that he had only requested the help of Cobb, a long-time friend and business associate, in raising $2800.00 to make his house payments as he was experiencing financial difficulty. Cobb informed the FBI of the meeting and was authorized to directly offer Long a bribe. That afternoon Cobb asked Long to vote the bill out of Committee. Long replied that he had already voted for the bill. Cobb gave Long $2800 several days later on May 22. The government contended this act constituted acceptance of bribe, which Long denied.
 
 
 11
 In late June, Kohn approached Long during a special Senate session and tried to get him to incriminate himself on tape, but failed in the effort. On the tape Long appears to be unaware of any agreement or unusual circumstances between the two. During an interview with the FBI on July 17, Long denied that he had received any cash payments from any lobbyist.
 
 
 12
 On August 20, 1991 Long was charged in a two-count indictment with conspiracy to violate the Hobbs Act, 18 U.S.C.Sec. 371, and a substantive violation of the Hobbs Act, 18 U.S.C. Sec. 1951. The trial began on November 15, 1991. At the close of the government's case, the district court entered a judgment of acquittal on the conspiracy count, stating that no reasonable jury could conclude beyond a reasonable doubt from the evidence presented that Long had knowingly joined a conspiracy. The defense immediately made a motion for acquittal on the substantive count or, in the alternative, a mistrial, stating that the jury had heard so much conspiracy evidence that they could not fairly decide the substantive count. The court stated that it did not see any problem with the spillover at that time and indicated it would give a limiting instruction on the conspiracy evidence in its charge to the jury. Long argued that no limiting instruction could sufficiently remove the taint by association created by the hearsay evidence presented by the government on the conspiracy count. When the jury returned they were informed that the conspiracy count was no longer part of the case and that they were not to consider it. No instruction to disregard the conspiracy evidence was given.
 
 
 13
 Long chose to put on no evidence. On November 23, 1991, after a charge conference the court gave instructions on the substantive count for violation of the Hobbs Act and the jury retired to deliberate. They returned with a guilty verdict. Long filed general post-trial motions which included an allegation that the conspiracy evidence was so prejudicial to defendant that no remedy other than a mistrial was sufficient. A hearing on the motions was held on January 22, 1992. As the hearing began Long's defense counsel filed a memorandum in support of the general motions which asserted that error had been committed when tapes, presented to the jury during trial as evidence of the conspiracy, were sent to the jury room for deliberations with no specific limiting instruction. There was some confusion at the hearing as to which tapes were being objected to and precisely what statements in them prejudiced Long on the substantive count. At the time of the hearing no one had any transcripts from trial.
 
 
 14
 Four months later on March 26, 1992, after the court was able to review the transcripts, it issued an order granting Long's motion for a new trial. The court explained that evidence, consisting of four tapes containing alleged co-conspirators' statements, which was properly admitted in the case so long as the conspiracy count survived, became improper inadmissible hearsay as a result of the judgment of acquittal on that count. These tapes went to the jury and to its deliberation room in error. The court noted that through "sheer oversight" it had failed to give its planned instruction concerning evidence conditionally admitted on the conspiracy count and that its instruction to disregard the conspiracy count was insufficient to cure the prejudice to Long. It granted a new trial. The government's motion for reconsideration was denied on July 2, 1992. This appeal followed.
 
 II.
 
 15
 During several points in the early stages of the trial, the government attempted to introduce surveillance tapes of the conversations between Cobb and other individuals. The defense objected to four of the tapes which involved discussions among either government informant Cobb and then legislators and alleged co-conspirators Kohn and Taylor or between Cobb and Kohn. They argued that the tapes contained hearsay statements which were not made in the furtherance of any conspiracy and, in any case, were irrelevant and unduly prejudicial to the defendant. The court conditionally admitted these four tapes under the co-conspirator statements exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E). A brief description of the tapes at issue is helpful.
 
 
 16
 Cobb testified first for the government. The April 26 and May 15 tapes were admitted while he was on the stand. Kohn was the last government witness and the May 1 and May 2 tapes were admitted while he was on the stand. In the April 26 tape Kohn, Cobb, and Taylor were discussing their list for supporters of the parimutuel bill. In a conversation as to which legislators Cobb or Taylor might be able to recruit, Cobb said, "Bud Long, that'll get some play." Kohn joined the conversation and they again reviewed the list of supporters. Kohn asked, in the context of legislators who did not accept bribes, if Bud Long would "go with us?" Cobb responded that he would. The May 1 tape between Cobb and Kohn began with Kohn remarking, "[h]e may be expecting a grand. Uh, let me smoke him out." The two continued discussing which legislators "might do some business" as they circled names of who they each would target. The only reference to Long occurred later on the tape when Kohn stated,"I gotta see Bud anyway on something else, I'll check." The May 2 tape recorded a discussion between Cobb and Kohn in which Kohn was reporting back to Cobb on who he had talked to about the bill. Kohn stated that "Bud Long's gonna scope the thing out and see...." The last contested tape records a May 15 meeting in which Cobb first told Kohn that he had paid off Senator Rick Lee. Kohn was then paid for his recruiting efforts. Toward the end of the conversation, Cobb recalled that he had previously mentioned Bud Long to which Kohn replied, "[w]hat does he think he needs, what's the strategy?" In addition to these references to Long, the tapes recorded Cobb, Taylor, or Kohn repeating out-of-court statements made to them by other members of the Legislature.
 
 
 17
 Although the conspiracy count was dismissed at the conclusion of the government's case, these tapes, along with other trial exhibits, were given to the jury without any limiting instruction.
 
 
 18
 We have held that where prejudicial evidence is improperly before the jury, the district court may grant a new trial if required in the interest of justice. United States v. Greene, 834 F.2d 86, 88 (4th Cir.1987). The district court did just that, ruling that submission of the tapes was prejudicial error because this conspiracy evidence may have influenced the jury verdict on the substantive count, especially considering the failure to give the planned limiting instruction. We review such a decision only for abuse of discretion. Greene, 834 F.2d at 88. The government contends that this ruling was an abuse of discretion because admission of the tapes in question was not error. It further argues that even if the admission was error there was no resulting prejudice and thus any error was harmless.
 
 Error
 
 19
 The government first argues that the judgment of acquittal on the conspiracy count did not necessitate the exclusion of the four tapes in question because the tapes are not hearsay or are within hearsay exceptions not considered by the court and are relevant to the substantive count.
 
 
 20
 The court, consistent with the mandate of Bourjaily v. United States, 483 U.S. 171 (1987), conditionally admitted the coconspirators' statements reasoning that the preponderance of the evidence standard could be met by independent evidence introduced later in the trial. See, e.g., United States v. Blevins, 960 F.2d 1252, 1256 (4th Cir.1992) (stating that it is proper to conditionally admit coconspirators' statements subject to subsequent satisfaction of requirements for their admission). However, the government was repeatedly warned that if it did not connect the conspiracy evidence up it was going to have a problem.[3] At the close of the government's case the court found such a problem, as it concluded the government had not presented sufficient evidence from which a jury could conclude beyond a reasonable doubt that a conspiracy existed, and it accordingly granted Long an acquittal on Count One. While the standard for an acquittal at the close of the government's case is higher than the preponderance standard necessary for admission of co-conspirators' hearsay statements in the first instance, the court's post-trial orders indicate that it concluded that the tapes did not have sufficient indicia of reliability because not in a natural setting. Accordingly, the court held that the admission of the tapes of co-conspirators' statements was error.
 
 
 21
 Removed from the conspiracy setting, the tapes were obvious hearsay and inadmissible for that reason. They were out-of-court statements offered to prove the truth of the matter asserted: that Long had taken a bribe. So the government's other arguments that they were admissible as background and the like are without merit.
 
 
 22
 We review a district court's evidentiary ruling, declining to admit otherwise inadmissible hearsay, for abuse of discretion only. The tapes were full, not only of Cobb and Kohn's own out-of-court statements, but also of statements allegedly made by non-testifying legislators which Cobb and Kohn were repeating to each other. The court, in an 11-page order, explained its reasons for rejecting the tapes as background evidence under United States v. Daly, 842 F.2d 1380 (2d Cir.), cert. denied, 488 U.S. 821 (1988). We note that the government accepted and in fact adopted the court's characterization of the tapes as co-conspirators' statements at trial. We further note that although the government argues that the district court did not consider admission under any alternative grounds, upon review of the record it appears that the district court did in fact consider and reject these alternative rulings. We are of opinion that the district court's decision to exclude the tapes other than as co-conspirators' statements clearly was within its discretion, even if not required. Thus, whether or not there are plausible alternative evidentiary rulings, we cannot say that the district court abused its discretion in the ruling it made.
 
 Harmless Error
 
 23
 We also agree with the district court's determination that this error prejudiced Long.[4] In assessing harmlessness of a non-constitutional error, we must ask whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 765 (1946). Where we can be sure that "the error did not influence the jury, or had but very slight effect," the conviction should stand. 328 U.S. at 764.
 
 
 24
 The government contends that any error was harmless. It argues that there was sufficient other evidence to sustain the conviction, the references to Long in the tapes were brief and ambiguous, Long did not object to the limiting instruction the court gave, and the jury did not actually view the tapes during deliberations.[5] We first note that as to discretionary assessments, such as the prejudicial effect of improperly admitted evidence, or of confusing instructions and the like, we give great deference to the traditional power of trial judges to avoid possible miscarriages of justice by ordering new trials in criminal cases. See generally Greene, 834 F.2d at 88; 3 Charles A. Wright, Federal Practice and Procedure Secs. 551, 553, 556 (1982). The general standard for determining if improperly admitted evidence is prejudicial is whether there is a "reasonable possibility that the jury's verdict was influenced by the material that improperly came before it." Greene, 834 F.2d at 88. A proper assessment goes beyond an evaluation of the untainted evidence and considers the "closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." United States v. Urbanik, 801 F.2d 692, 698 (4th Cir.1986). Upon consideration of these factors, we are of opinion that Long was prejudiced by the evidence in the four tapes.
 
 
 25
 The evidence against Long was not strong on the substantive count. The government's theory was that Long came to Cobb on May 17 because he knew Cobb was paying people off and would not refuse Long's request for $2800 with the vote pending in his committee. Although some of Cobb's testimony supported such a theory, Cobb, as the government's principal witness, also testified that Long did not know he was accepting a bribe. Cobb stated that he and Long were close personal friends, that Long had sent him $100,000 in business of the past, and that never had any illegal payments been made or even suggested. He stated that there was no mention whatsoever about legislation, parimutuel or otherwise, during their conversation about the $2800 Long needed to make his house payments. Both the government and the defense showed that Long had held an interest in the parimutuel bill and all similar legislation for years. Kohn's testimony, as a major government witness, was shown at trial to be insufficient to sustain the conspiracy charge.
 
 
 26
 As to the centrality of the issue affected by the error, we note that the audio and video-tapes played a key role in the trial. These four tapes in particular recorded suspicious conversations between Kohn, Cobb, and Taylor made while they planned, recruited, and counted-up votes, bought and otherwise, for the parimutuel bill. After lengthy objections and bench conferences, the four tapes were played and emphasized for the jury. While the references to Long in these tapes were brief, they tended to connect Long by association to the statements, conduct, and motive of non-testifying senatorial and house members who the jury knew had received bribes. The jury went about its deliberations with the tapes erroneously in hand.
 
 
 27
 Lastly, little was done which may have mitigated the effects of the error. The only curative instruction the court gave was one to disregard the conspiracy count. No limiting instruction to disregard conspiracy evidence, much less the specific tapes in question, was ever given due to the acknowledged inadvertence of the court. Under such circumstances we can not say that it is "highly probable that the error did not affect the judgment," United States v. Nyman, 649 F.2d 208, 212 (4th Cir.1980), and we cannot say "with fair assurance, after pondering all that happened, without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Kotteakos, p. 765.
 
 
 28
 We are thus of opinion that the district court did not abuse its discretion in granting Long a new trial.
 
 
 29
 The order of the district court appealed from is AFFIRMED.[6]
 
 
 
 [1]
 The opinion of the district court discloses that transcripts of the conversations in three of the four tapes also went to the jury with the tapes. The affidavits mentioned later in n. 6, do not mention the transcripts
 
 
 [2]
 This case is only one of the numerous appeals we have heard arising out of the Operation Lost Trust prosecutions
 
 
 [3]
 This court has held that, as to order of proof which was left open in Bourjaily, the district court has discretion to admit a co-conspirator's statement subject to it being connected up later through introduction of sufficient evidence of the existence of the conspiracy and the declarant's participation. Blevins, 960 F.2d at 1256
 
 
 [4]
 The court explained that, in view of sufficient but not overwhelming evidence, the lack of a cautionary instruction and the presence of the tapes in jury room combined so that it could not determine that the disputed evidence did not contribute to the verdict
 
 
 [5]
 The Government's argument that Long's counsel somehow consented to or waived the tapes going to the jury because he did not specifically request a jury instruction is meritless. Long's counsel made repeated objections to admission of the tapes during trial, explained during the charge conference that no instruction was adequate to cure the error, and brought up the error in his post-trial motions. We find that the error was preserved
 
 
 [6]
 The district court did not give any weight in its opinion to the fact that certain affidavits had been filed by the government, with respect to the jury's deliberations, at the hearing on the government's motion for reconsideration of the district court's granting of a motion for a new trial
 A statement was apparently made by the forelady of the jury (that statement is not in the record), who apparently stated that she did not remember the jury listening to the tapes but stated that other jurors might know more. Affidavits were also secured by the government from two other jurors who stated that the jury did not listen to the tapes during its deliberations.
 Federal Rule of Evidence 606(b) grows out of the ancient rule that a juror may not impeach his own verdict. That rule provides in part that "a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations." It also provides, however, that a juror may testify as to "whether extraneous, prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."
 In this case, there is no doubt that the government did gather jurors' statements about a "matter or statement" occurring during the jury's deliberations, and certainly the inference the government sought to draw was whether there was any "effect of anything upon ... any ... juror's mind," prohibited in 606(b) also. It is also without doubt that there was no "extraneous prejudicial information" involved here, the tapes having been introduced into evidence during the trial. Neither is there any claim of any "outside influence" brought to bear upon any juror.
 So the government committed multiple violations of Rule 606(b) in procuring these affidavits. The district court certainly did not err in not giving them any weight, and its failure to heed them is, even if they are true, also correct. In that connection, we mention that the affiants remarkably did not mention whether or not they saw the transcripts also delivered to them. Prejudice is presumed from their availability to the jury. United States v. Barnes, 747 F.2d 246 (4th Cir.1984).